## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO.:

_____

| | |
|---|---|
| **JAMES P. SLAVAS and** | ) |
| **SPRAY RESEARCH, INC.,** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **TOWN OF MONROE, and DAVID NASH, as a** | ) |
| **member of the BOARD OF SELECTMEN OF** | ) |
| **MONROE, and LARRY THORESON and CARLA** | ) |
| **DAVIS-LITTLE, individually and as they are** | ) |
| **members of the BOARD OF SELECTMEN OF** | ) |
| **MONROE, and D. J. OAKES and STEPHEN** | ) **COMPLAINT** |
| **EDDINGTON , as they are or were members of the** | ) |
| **BOARD OF SURVEY OF MONROE, and LARRY** | ) |
| **THORESON and CARLA DAVIS-LITTLE,** | ) |
| **individually and as they are or were members of the** | ) |
| **BOARD OF SURVEY OF MONROE, and** | ) |
| **BRENDA J. CHURCH, individually and in her** | ) |
| **capacity as Building Commissioner of Monroe,** | ) |
| | ) |
| **Defendants** | ) |

_____)

## I.  NATURE OF THE ACTION

1.      This is a Complaint brought pursuant to Title 42, United States Code, §1983.  Jurisdiction is invoked both under Title 28, §1343(3) and under Title 28, §1331. The Plaintiffs further invoke the pendent jurisdiction of this Court to hear and decide claims arising under state law. The amount in controversy exceeds Seventy Five Thousand ($75,000.00 ) Dollars exclusive of interest and costs. Plaintiffs assert that Defendants individually and acting in concert violated rights secured to them under the Fourth, Fifth, and Ninth Amendments of the Constitution of the United States as secured by the Fourteenth Amendment of the Constitution of the United States.

2.      Plaintiffs also state a claim for attorneys' fees and costs pursuant to 42 U.S.C. 1986. Plaintiffs also claim damages in the amount of Seven Hundred Fifty Thousand ($750,000.00) Dollars.

## II.  PARTIES

3.      James P. Slavas is the President and Owner of Spray Research, Inc.   Mr. Slavas resides at 2 Old Egypt Road, Wendell, Massachusetts.

4.      Spray Research, Inc. ("SRI") is a corporation licensed to do business in the Commonwealth of Massachusetts.  Until July of 2015, SRI's principal place of business was located at 16 Depot Street, Monroe, Massachusetts.  SRI now operates from 10 Old Egypt Road, Wendell, Massachusetts.

5.      The Town of Monroe is a municipal corporation in Franklin County, Commonwealth of Massachusetts, with a principal office located at Town Hall, 3-C School Street, Monroe Bridge, Massachusetts.

6.      The Board of Selectmen of Monroe is a duly constituted municipal agency of the Town of Monroe, with a principal office located at Town Hall, 3-C School Street, Monroe Bridge, Massachusetts.

7.      David Nash is a member of the Board of Selectmen of Monroe, and resides in Monroe, Massachusetts.  Mr. Nash is named as a member of the Board of Selectmen.

8.      Larry Thoreson is a member of the Board of Selectmen of Monroe, and resides in Monroe, Massachusetts.  Larry Thoreson also is or was a member of the Board of Survey named in this Complaint.  Mr. Thoreson is named both individually and as a member of the Board of Selectmen and the Board of Survey.

9.      Carla Davis-Little is a member of the Board of Selectmen of Monroe, and resides in Monroe, Massachusetts.  Carla Davis-Little also is or was a member of the Board of Survey named in this Complaint.  Ms. Davis-Little is named both individually and as a member of the Board of Selectmen and the Board of Survey.

10.     The Board of Survey of Monroe is putatively a duly constituted municipal agency of the Town of Monroe, with a principal office located at Town Hall, 3-C School Street, Monroe Bridge, Massachusetts.

11.     D. J. Oakes is or was a member of the putative Board of Survey of Monroe, and resides in Monroe, Massachusetts.  Mr. Oakes is named as a member of the putative Board of Survey.

12.     Stephen Eddington is a Civil Engineer III with the Massachusetts Department of Transportation and a member of the putative Board of Survey of Monroe.  Mr. Eddington is named as a member of the putative Board of Survey.

13.     Brenda J. Church is the Building Commissioner of Monroe with an office located at Town Hall, 3-C School Street, Monroe Bridge, Massachusetts. Ms. Church is named both individually and in her capacity as Building Commissioner.

14.     At all times relevant to this Complaint and in all the actions described herein, the Defendants were acting under color of law and under color of their authority as elected and appointed officials of the Town of Monroe.

15.     During all times mentioned in this Complaint, the Defendants and each of them, separately and in concert, engaged in acts and omissions which constituted deprivation of the constitutional rights, privileges and immunities of the Plaintiffs, including Plaintiffs' rights to due process of law as secured by the Fourth, Fifth, and Fourteenth Amendment and specifically Plaintiffs' rights to be free from illegal search and seizure and unauthorized intrusion and illegal entry into their premises, represented by the Fourth, Fifth and Ninth Amendments, all as secured by the Fourteenth Amendment of the Constitution of the United States .

### III.   STATEMENT OF THE FACTS

16.     In 1999, SRI commenced operations at so-called "Building 1" of the former Deerfield Glassine paper mill in Monroe.  The mill complex consists of four separate buildings.  These buildings are locally known as the Green Building, Building 1, Building 2, and Building 3.  Building 1 has a footprint of 135' x 72' and is reinforced concrete pier and girt construction with brick infill and steel-framed windows between the exterior piers.  It comprises four (4) floors.  All floors are concrete, as are all support columns and girts below the fourth floor or grade level.  The roof and its support framing are heavy timber construction. The lowest part of the roof structure is 13' 6" above floor level.

17.     The mill complex is owned by Monroe Bridge Holding Corporation ("MBHC"), with addresses at 16 Depot Street, Monroe, and 384 Park Road, Pleasant Valley, Connecticut.

18.      On August 13, 1999, SRI entered into a lease arrangement with MBHC with a term of fifteen (15) years.  The leased premises was located on the fourth floor or grade level of Building 1.  Since 2014, SRI has had a periodic tenancy or a tenancy at will with MBHC.  SRI and James P. Slavas have a property interest in Building 1 by virtue of this ongoing leasehold.

19.     On September 2, 1999, SRI was issued Building Permit Number 25017-B by the Franklin County Cooperative Inspection Program for the purpose of making renovations to 4th floor of Building 1 to create a research and development laboratory.  The work area comprised 4,145

square feet, or about one-half of the total floor area. The remainder of the floor area serves as an unimproved and unheated storage area.  It is not provided with electrical, gas or water utilities.

20.     Inspections of the electrical, plumbing and gas work were performed prior to the connection of the utilities in 1999.  A framing inspection of the partitions was also performed. The Town of Monroe left the cooperative program in 2000 before a Certificate of Occupancy was issued.

21.     SRI, founded in 1995, is an independent testing, research and development laboratory specializing in the objective, sophisticated characterization of all aspects of spray atomizer performance, investigation of sprays behavior, and the application of spray technologies to process and product development.

22.     SRI occupied the premises at Building 1, 16 Depot Street, Monroe Bridge, MA for sixteen (16) years. In addition to an extensive inventory of expensive and delicate analytical instruments, the laboratory included a large low-speed wind tunnel, a large closed-loop water tunnel with a pumping capacity of 14,000 gallons per minute, a large 16' x 10' x 8' spray test chamber, a substantial stainless steel high-pressure test vessel (up to 550 psig) with associated complex controls, two (2) pilot-scale spray dryers, two (2) spray towers, a number of experimental test setups, a cnc turning center, a cnc vertical milling center, a fully-equipped prototype shop with a substantial tooling inventory, nine (9) large (7.5 -60 HP) pumps and compressors as well as numerous digital read-outs, flow- and pressure transducers, computer-controlled traverses and instruments to characterize the physical characteristics of liquids.

23.     The total laboratory equipment inventory comprised over 1,060 items.

24.     On May 19, 2015, SRI had  commissions or substantially completed negotiations for laboratory studies with the following entities:

        *       Cabot Corporation
        *       Spraying Systems Company
        *       Shell Oil
        *       Akron Brass
        *       National Oceanographic and Atmospheric Administration
        *       Cummins Diesel
        *       Guardian Industries
        *       RimRock Corporation

25.     On or about April 20, 2015, Brenda J. Church was appointed to the post of Building Commissioner by the Monroe Board of Selectmen.

26.     At a time unknown, before or after Ms. Church assumed this position, she made an inspection of the mill complex.

27.     G.L. c. 143, s. 6 states:

> Section 6. The local inspector, immediately upon being informed by report or otherwise that a building or other structure or anything attached thereto or connected therewith in that city or town is dangerous to life or limb or that any building in that city or town is unused, uninhabited or abandoned, and open to the weather, shall inspect the same; and he shall forthwith in writing notify the owner, lessee or mortgagee in possession to remove it or make it safe if it appears to him to be dangerous, or to make it secure if it is unused, uninhabited or abandoned and open to the weather. If it appears that such structure would be especially unsafe in case of fire, it shall be deemed dangerous within the meaning hereof, and the local inspector may affix in a conspicuous place upon its exterior walls a notice of its dangerous condition, which shall not be removed or defaced without authority from him. Upon such notice under either of the preceding sentences, the owner, lessee or mortgagee in possession shall furnish a floor plan of such building or other structure to the chiefs of the fire and police departments of the city or town.

28.     It is unclear how Ms. Church, the "local inspector," was "informed by report or otherwise" that Building 1 was allegedly unsafe.  Ms. Church has stated that prior to her appointment as Building Commissioner, she viewed Building 1 from the exterior.  If Ms. Church did inspect Building 1 after her appointment as Building Commissioner, but prior to May 1, 2015, she did not "forthwith in writing notify the owner, lessee [Mr. Slavas] or mortgagee in possession to remove it or make it safe."

29.     G.L. c. 143, s. 7 states:

> Section 7. Any person so notified shall be allowed until twelve o'clock noon of the day following the service of the notice in which to begin to remove such structure or make it safe, or to make it secure, and he shall employ sufficient labor speedily to make it safe or remove it or to make it secure;  but if the public safety so requires and if the aldermen or selectmen so order, the inspector of buildings may immediately enter upon the premises with the necessary workmen and assistants and cause such unsafe structure to be made safe or taken down without delay, and a proper fence put up for the protection of passers-by, or to be made secure. If such a building or structure is taken down or removed, the lot shall be leveled to uniform grade by a proper sanitary fill to cover any cellar or foundation hole and any rubble not removed.

30.     Because Ms. Church did not notify the lessee of any alleged unsafe condition, as required by G.L. c 143, s. 6, James P. Slavas and SRI could not take advantage of the opportunity provided by G.L. 143, s. 7 to act quickly to correct any alleged deficiency observed by Ms. Church.

31.     Instead, on May 1, 2015, Ms. Church allegedly convened a Board of Survey pursuant to G.L. c. 13, s. 8, which states:

> Section 8. If an owner, lessee or mortgagee in possession of such unsafe structure refuses or neglects to comply with the requirements of such notice within the time limited, and such structure is not made safe or taken down as therein ordered, or made secure, a careful survey of the premises shall be made by a board consisting in a city of the city engineer, the head of the fire department, as such term is defined in section one of chapter one hundred and forty-eight, and one disinterested person to be appointed by the local inspector, and in a town of a surveyor, the head of the fire department and one disinterested person to be appointed by the local inspector. If there is no city engineer in such city or no head of the fire department in such city or town, the mayor or selectmen shall designate one or more officers or other suitable persons in place of the officers so named as members of said board.  A written report of such survey shall be made, and a copy thereof served on such owner, lessee or mortgagee in possession.

32.     Neither James P. Slavas nor SRI, the lessees of the allegedly unsafe Building 1, could "refuse[] or neglect[] to comply with the requirements of such notice," as set forth in G.L. c. 143, s. 8, because they did not get the required notice from Ms. Church.

33.     G.L. c. 30A, s. 18 defines the term "public body," for the purposes of the Commonwealth's Open Meeting Law, as follows (in pertinent part):

> "Public body", a multiple-member board, commission, committee or subcommittee within the executive or legislative branch or within any county, district, city, region or town, however created, elected, appointed or otherwise constituted, established to serve a public purpose;

34.     A Board of Survey is a public body for the purposes of the Open Meeting Law.

35.     G.L. c. 30A, s. 20 states, in pertinent part, that all meetings of a local public body shall be open to the public after posted notice:

> Section 20. (a) Except as provided in section 21, all meetings of a public body shall be open to the public.

(b) Except in an emergency, in addition to any notice otherwise required by law, a public body shall post notice of every meeting at least 48 hours prior to the meeting, excluding Saturdays, Sundays and legal holidays. In an emergency, a public body shall post notice as soon as reasonably possible prior to the meeting. Notice shall be printed in a legible, easily understandable format and shall contain the date, time and place of the meeting and a listing of topics that the chair reasonably anticipates will be discussed at the meeting.

c) For meetings of a local public body, notice shall be filed with the municipal clerk and posted in a manner conspicuously visible to the public at all hours in or on the municipal building in which the clerk's office is located.

36.    The Monroe Board of Survey has never posted any meeting, as required by G.L. c. 30A, s. 20 of the Open Meeting Law.

37.    Instead, on May 1, 2015, the putative Board of Survey simply convened an unposted meeting at the mill complex, and conducted an inspection of the complex, including Building 1. The only notice provided to Mr. Slavas and SRI was a telephone call on April 30, 2015, to Mr. Slavas from Ms. Davis-Little.

38.    This inspection was not conducted in compliance with the procedures set forth in G. L. c. 143, s. 6, in that it was not preceded by a notice of allegedly unsafe conditions, in writing, to the lessee in possession as set forth therein, and it was not conducted in compliance with G.L. c. 143, s. 8, in that it was not preceded by the lessee's refusal or neglect to comply.

39.    Immediately following this illegal inspection, the Board of Survey deliberated near SRI's loading dock for approximately ten minutes, still in violation of the Open Meeting Law, G. L. c. 30A, s. 20.  These deliberations were recorded by a security camera.  The Board of Survey apparently determined that the entire mill complex was unsafe.

40.    There are no minutes of this, or any other, meeting of the Board of Survey on file with the Town Clerk of Monroe, a violation of G.L. c. 30A, s. 22.

41.    Following this illegal inspection, Ms. Church did not issue "a written report of such survey" and did not serve a copy thereof on the owner, lessee or mortgagee in possession, all in violation of G.L. c. 143, s. 8.

42.    G.L. c. 143, s. 9 states, in pertinent part:

Section 9. If such report declares such structure to be dangerous or to be unused, uninhabited or abandoned, and open to the weather, and if the owner, lessee or mortgagee in possession continues such refusal or neglect, the local inspector shall cause it to be

made safe or taken down or to be made secure, and, if the public safety so requires, said local inspector may at once enter the structure, the land on which it stands or the abutting land or buildings, with such assistance as he may require, and secure or remove the same, and may remove and evict, under the pertinent provisions of chapter two hundred thirty-nine or otherwise, any tenant or occupant thereof, and may erect such protection for the public by proper fence or otherwise as may be necessary, and for this purpose may close a public highway. In the case of such demolition, the local inspector shall cause such lot to be levelled to uniform grade by a proper sanitary fill.

43.    On May 18, 2015, the Monroe Board of Selectmen had a regular meeting.  At this meeting Selectperson Davis-Little informed the Board of the contents of an email sent to her on May 13, 2015 by Ms. Church. In part, this message stated:

I have been doing some research on each step and will be sending it to you. The first step is to start the foreclosure and then the building. There are only four law firms that do this process in the state. I have worked with one of them and will forward email. This must be done so we can take action on the person who is in the building illegally.

44.    The email does not disclose or indicate to the Board of Selectmen that Ms. Church intended to initiate any imminent enforcement action against Mr. Slavas and SRI on the following day.

45.    On May 19, 2015, Ms. Church, without prior notice, without having issued the required report set forth in G.L. c. 143, s. 8, arrived at Building 1.  She was accompanied by State Troopers Biron and Trombley, and Louise Vera, the State Building Inspector for District 2.  The State Troopers escorted Mr. Slavas from SRI's facilities in Building 1 and Ms. Church posted the building with "Condemned as Dangerous and Unsafe" placards, which cited G. L c. 143, ss. 3 and 3A.  No written Notice or Order was submitted to Mr. Slavas.

46.    As set forth above, this eviction was not conducted in compliance with the procedures in G.L. c. 143, ss. 6, 8, and 9.   The eviction was not conducted under the pertinent provisions of G.L. c. 239.

47.    On information and belief, at a meeting of the Board of Selectmen held in executive session on May 26, 2015, Ms. Church presented to the Board a report of the Board of Survey entitled "Damaged remains of The Deerfield Glassine paper Mill, 16 Depot Street, Monroe, MA 01350."  Mr. Slavas did not receive a copy of this report until June 11, 2015, after his eviction.

48.    G.L. c. 143, s. 10 states, in pertinent part:

Section 10. An owner, lessee or mortgagee in possession aggrieved by such order may have the remedy prescribed by section two of chapter one hundred and thirty-nine; provided, that no provision of said section two shall be construed so as to hinder, delay or prevent the local inspector acting and proceeding under section nine ....

49.     G.L. c. 139, s. 2 states:

A person aggrieved by such order may appeal to the superior court for the county where such building or other structure is situated, if, within three days after the service of such attested copy upon him, he commences a civil action in such court. Trial by jury shall be had as in other civil causes. The jury may affirm, annul or alter such order, and the court shall render judgment in conformity with said verdict, which shall take effect as an original order. If the order is affirmed, the plaintiff shall pay the costs; if it is annulled, he shall recover from the town his damages, if any, and costs; and if it is altered, the court may render such judgment as to costs as justice shall require. All proceedings hereunder authorized by section ten of chapter one hundred and forty-three, after issue is joined therein, shall be in order for trial and shall have precedence over any case of a different nature pending in said court and then in order for trial.

50.     Mr. Slavas and SRI were deprived of this remedy by the illegal actions of Ms. Church. She did not issue any order in writing on May 19, 2015.  Mr. Slavas and SRI never received an attested copy of any order, as required in G.L. c. 139, s. 2.   By then, the eviction had occurred and SRI's business was disrupted, if not destroyed.

51.     On the evening of May 26, 2015, before entering into the afore-mentioned executive session, at an "emergency" meeting of the Board of Selectmen the Board discussed Ms. Church's actions with regard to SRI and Building 1.   Ms. Church was in attendance, as was Mr. Slavas, his attorney, Kevin Parsons, and his structural engineer, Robert Leet of Whetstone Engineering, Inc.

52.     At the request of Mr. Slavas, Whetstone Engineering had performed a structural analysis of Building 1, which was prepared and stamped by Mr. Leet between May 19, 2015 and May 26, 2015.   The Whetstone analysis was summarized for the Board of Selectmen by Mr. Leet at its meeting on May 26, 2015.  A copy was provided to Ms. Church.  The building was found to be structurally competent and to present no "imminent danger of failure or collapse endangering life and limb and/or public safety."   The structural assessment of Building 1 found "all floors to be competent with no major damage or deterioration."   The assessment also stated that the roof showed "signs of recent leakage and minor repairs, but no indication of major damage or deterioration."   As to the loading dock in Building 1, the assessment found that "although in need of some repair, the loading dock in its current state is capable of handling the loads required for removing the spray research equipment, including pallet jacks, dollies and other moving equipment."

53.     This finding by Whetstone Engineering, Inc. With regard to Building 1, was consistent with an analysis of structural safety performed approximately one year earlier.  Prior to the reconstruction of a highway bridge adjacent to the mill complex, the Massachusetts Department of Transportation ("DOT") commissioned a survey to assess the structural integrity of the mill complex.  The report was prepared by Geosciences Testing and Research, Inc.  The file is GTR Project No. 14.113.  A copy of this Report was provided to the Town of Monroe in 2014.  The

Report states that the Green Building, not Building 1, is in poor condition. The Report states there is "minor wear and tear" in SRI's space in Building 1 and notes "cracks above a couple of the windows" with "staining and cracking on the North wall."  The DOT Report does not characterize Building 1 as structurally unsound.

54.     After receiving this information from Mr. Slavas, Mr. Leet, and other members of the public in open session, the Board of Selectmen then convened an executive session with Ms. Church and Town Counsel Donna MacNicol of Greenfield.  The executive session violated G.L. c. 30A, s. 21, as there was no exemption that covered the circumstances.

55.     Thereafter, on June 1, 2015, Mr. Slavas received a Revised Notice of Violation under G. L. c. 143, s. 9, again without observance of required procedures.  This Notice indicated that "It is my (Ms. Church's) intention to allow over a period of five days Mr. Slavas to remove the equipment he utilizes to operate his business".   However, this notice did not set forth the specific repairs required to bring any individual building into compliance, again in violation of G.L. c. 143, ss. 6, 8, and 9.

56.     The report or order of Ms. Church with regard to Building 1 was finally made available by Monroe Town Clerk Marcella Stafford-Gore to Mr. Slavas and SRI on or about June 11, 2015, twenty-seven (27) days after the eviction of SRI, in violation of G.L. c. 143, ss. 6 and 8.

57.     Between June 1 and June 6, 2015, James Slavas and his employee worked 15 hours per day to process the most valuable and portable pieces of equipment and remove them to temporary storage at a self-storage facility.

58.     On June 3, 2015 at the request of Town Counsel Donna MacNicol, Mr. Slavas submitted to Ms. Church a comprehensive listing of the equipment remaining in the mill enumerating the tasks and time required for disassembling, packing and removing each of the major pieces of equipment. Mr. Slavas estimated that a minimum of 288 hours was required.

59.     On June 4, 2015, Mr. Slavas requested that Mr. Gordon Bailey, State Inspector for District 1, "consent to an expedited inspection of Building 1 [so-called] of the former Deerfield Glassine paper mill in Monroe Bridge and render an opinion as to whether eviction action initiated by the Building Commissioner under MG.L. 143: Section 9 is warranted."  Mr. Bailey forwarded this request to Louise Vera, explaining that "Vera covers that area and provides technical assistance to Municipal Inspectors, design professionals and owners."

60.     On June 5, 2015, Ms. Church issued a No Trespassing Order (the "June 5th Order") "for the property located at 16 Depot Street, Monroe, MA in accordance with M.G.L. c. 266 sec. 120."  The June 5th Order also required the submission by June 12, 2015, of:

*       a floor plan identifying the locations and areas of 16 Depot Street, Monroe, MA that house the equipment to be removed;

*       a floor plan identifying the safe egress paths to be utilized by the movers; and

\*      a stamped document from a Massachusetts design professional identifying the means and
methods and means of egress that will be utilized to accomplish the move.

61.     On June 8, 2015, Mr. Slavas submitted to Ms. Church the two floor plans required in her
June 5th Order.

62.     On June 11, 2015, Mr. Slavas submitted to Ms. Church the stamped document from a
Massachusetts design professional required in her June 5th Order.

63.     On June 15, 2015, Ms. Church issued a Response (the "June 15th Response") to Mr.
Slavas' request for additional time to remove the equipment of SRI from Building 1.  She
approved a "maximum of 9 days with 4 workers working 8 hours per day."

64.     Removal of all of SRI's equipment could not be accomplished in an orderly and safe
manner within the nine days stipulated by the June 15th Response.

65.     SRI's larger items required partial disassembly and careful preparation to avoid damage
in shipping. At least three (3) of the items required the services of a rigging company for loading
and transport.

66.     SRI's scientific instruments required very careful attention to disassembly and packing so
as to avoid ESD damage, loss of critical internal alignments, and damage to delicate optical
components. The argon ion lasers were particularly susceptible to vibration-induced damage to
their delicate glass Brewster windows, the breakage of which renders the laser inoperable and
generally irreparable.

67.     In her June 15th Response, Ms. Church required additional information from Mr. Slavas,
noting that:

\*      the equipment list provided by Mr. Slavas did not match in detail the equipment
enumerated on the engineer's drawing;

\*      the drawing did not include egress to the public way; and

\*      the drawing did not identify the means and methods to be utilized.

68.     In the June 15th Response, Ms. Church set a deadline of June 19, 2015 for the submission
of these additional documents.

69.     In her June 15th Response, Ms. Church stated that stated that Building 1 posed a "danger
to life and limb."  However, this finding directly contradicts the analysis performed in May of
2015 by Whetstone Engineering, Inc., and the analysis performed in 2014 by Geosciences

Testing and Research, Inc., for the DOT.   Both studies determined that Building 1 was structurally sound.

70.    On June 16, 2015, Mr. Slavas contacted State Building Inspector Vera to reiterate his request of June 4, 2015 for an inspection of Building 1.

71.    On June 18, 2015, without prior notice to Mr. Slavas and/or his agent(s), Ms. Vera, Mr. Bailey, and Ms. Church inspected Building 1.  Their "inspection" was restricted to the exterior of the building.

72.    Ms. Vera subsequently found that "the building is seriously compromised." It is unclear whether she was referring to the Green Building, Building 1, or the entire mill complex.  No detailed summary or report of this inspection was provided to Mr. Slavas.

73.    On June 19, 2015, Mr. Slavas requested additional time from Ms. Church to comply with the June 15th Response, citing, as grounds, the unavailability of his engineer.  He also requested that she provide guidance as to "what degree of resolution the equipment list, removal means and methods and egress paths need to be drawn."

74.    On June 28, 2015, the Monroe Board of Selectmen met and reappointed Ms. Church as Building Commissioner. The recorded vote was two to one, with Mr. Nash voting in the negative.

75.    On June 30, 2015, Mr. Slavas forwarded to Ms. Church his engineer's revised removal drawing.

76.    No response was received from Ms. Church.  On July 21, 2015, Mr. Slavas requested access to Building 1 for the purpose of removing some personal items, two or three file boxes containing confidential customer information, sensitive test data and company financial documents, and the main laboratory data server computer.   All of these items were small and light enough to be hand-carried from the building.  He also informed Ms. Church that one of SRI's security cameras needed to be rebooted in order to reestablish the network connection.

77.    On July 21, 2015, Ms. Church responded as follows:

    "You are not to be in the building until you provide me with all the requested documentation. All I have received is an update floor plan from you. At this time, I must move forward and issue the order to board and secure the building. You are trespassing if you enter the building at this time."

78.    On July 21, 2015, Mr. Slavas again sought clarification from Ms. Church as to what documents or information was required noting that he had fully complied with the Order of June

5th and that the June 15[th]Response substantially modified the conditions of the June 5th Order. He also noted that the remaining equipment inventory number in excess of 1,060 items.  Ms. Church responded that "I believe it has been made clear what is needed".

79.     On July 24, 2015, Mr. Slavas filed an appeal to the State Building Code Appeals Board requesting modification of the June 15th Response to allow forty-five days in which to effect the removal of the stranded equipment.

80.     On August 8, 2015, Ms. Church responded to Mr. Slavas' request of July 21, 2015 for clarification:

> I am giving you from August 11th-21st, 2015 to remove any equipment you have at 16 Depot, Monroe, MA. On August 24th, 2015 I will have the building secured and utilities to the building shut off. Please insure that your equipment is removed and all personal locks are removed from the building."

81.     On August 10, 2015, the Monroe Board of Selectmen met and discussed the eviction of Mr. Slavas and SRI from Building 1.  The Board of Selectmen voted to request Ms. Church to grant the Mr. Slavas and SRI twenty-four days to remove his personal property from the building." The Board stressed that they "would like this matter resolved." The Board did not want "the vast inventory of Spray Research to become the responsibility of the Town of Monroe."

82.     On August 11, 2015, Ms. Church acquiesced to the Board's request to grant additional time to Mr. Slavas but in doing so stated "I feel going against the recommendation of the State Inspector's after Mr. Slavas requested that they conduct an inspection would not be right."

83.     Between August 11, 2015, and August 24, 2015, Mr. Slavas and his employee removed additional equipment.  Because the advance notice and time frame provided by Ms. Church to Mr. Slavas was so short, the attempt to engage a rigging company to remove the largest equipment was unsuccessful. Most of the heavy equipment was broken up and removed for scrap by a private salvager.

84.     On August 12, 2015, Mr. Slavas received a telephone call from Patricia Barry, Clerk to the State Building Code Appeals Board, stating that she has rejected the appeal application after speaking with Ms. Church. Ms. Barry determined that since the equipment removal order was subsequent to a determination under G.L. c. 143, s. 9, the State Building Code Appeals Board was without jurisdiction.

85.     On August 30, 2015, Mr. Slavas provided the Town of Monroe a detailed inventory of the equipment stranded in the mill at the conclusion of Ms. Church's August 24, 2015 deadline. Acquisition cost of the equipment exceeded $65,000, with replacement cost estimated at $135,000.

86.     On September 28, 2015, Mr. Slavas forwarded to the Monroe Board of Selectman a letter requesting "a formal statement of intentions with regards to securing the Spray Research equipment stranded in Building 1 of the 16 Depot Street Ramage Mill complex."

87.     Thereafter, on September 29, 2015, Ms. Church recommended to the Monroe Board of Selectmen that Mr. Slavas be allowed further access to Building 1 to remove his equipment and possessions.

88.     On October 18, 2015, Ms. Church informed Mr. Slavas by correspondence that he had an additional thirty (30) days to remove his remaining equipment.  Smaller items removed one day.

89.     Mr. Slavas was not able to remove all of his equipment from Building 1.

90.     As a direct cause and specific consequence of the actions of the Defendants the business of James Slavas and Spray Industries, Inc. was disrupted if not destroyed, absent any legal authority to do so and without due process of law.

91.     Since May 19, 2015, as a consequence of the actions of Monroe's officials and boards, all of the commissions and negotiations listed in paragraph 18, above, have been terminated. Subsequent to the May 19, 2015 eviction, SRI has had to refuse to negotiate the performance of additional studies for the following companies:

        *       Babcock and Wilcox
        *       Cabot Corporation
        *       John Zink Company
        *       Birla Carbon
        *       Aerodyne
        *       Faber Combustion Burner Company
        *       Orbital ATK, Incorporated
        *       Nebia
        *       Industrial Mechanical Specialties

92.     The estimated total value of these lost studies or commissions is approximately $275,900.00.

93.     Equipment has been left in place in Building 1.  This equipment, which could not be

moved by SRI due to the orders of Monroe's boards and officials, has a replacement value of $142,041.00.

94.     SRI has been forced to temporarily relocate to a much smaller location providing 1,200 square feet of space and requiring that the testing and research capabilities provided by SRI be significantly degraded.  Partial laboratory operations are scheduled to be available at this location by late May 2016.  Costs associated with the temporary relocation total $49,085.00.

95.     The search for a permanent location for SRI continues, but it is clear that lease costs associated with an appropriate location will be an order of magnitude greater than those at the former Monroe site.

96.     The personal income of Mr. Slavas has been reduced by at least $57,400.00.

97.     Restoring the pre- May 19, 2015 capabilities of Spray Research at a new permanent location will require almost a year's time with an estimated cost of $443,957.00.

98.     Leasehold improvements to the Monroe facility which SRI was forced to abandon total $104,215.00 net of accumulated depreciation.

### COUNT I: Town of Monroe
### 42 U.S.C. §1983

99.     Plaintiffs reallege paragraphs 1 - 98 of the Complaint and incorporate same by reference hereunder.

100.    The Town of Monroe, acting through its Board of Selectmen, putative Board of Survey, and Building Commissioner, acted in conscious disregard for the constitutional rights of the Plaintiffs. The Town of Monroe was deliberately indifferent to the rights of Plaintiffs and specifically violated procedures set forth in Massachusetts law.

101.    The actions of the Board of Selectmen, putative Board of Survey, and Building Commissioner constituted decisions by the final authorities in the Town of Monroe and represented the establishment of municipal policy with respect to the order to evict Mr. Slavas and SRI from Building 1.

102.    The decision by the Board of Selectmen, the putative Board of Survey, and the Building Commissioner to evict Mr. Slavas and SRI from Building 1 represented decisions by the final policy making authority in the Town of Monroe and were the legal equivalent of formal policies enacted by the Town of Monroe.

103.    The legal authority for the decisions undertaken by the individual Defendants rested in the individual Defendants solely pursuant to their official positions and no other representative of the Town of Monroe retained any authority to overrule the decisions, actions and policies of the Defendants.

104.    The actions of the Town of Monroe represented official policy of the Town of Monroe and constituted deliberate indifference to the constitutional rights of the Plaintiffs. The actions of the Town of Monroe violated Massachusetts law and were patently illegal.

105.    Plaintiffs were deprived of their property interest in Building 1 under their lease from MBHC when Defendants, acting under color of state law, deprived them of that interest without constitutionally adequate process.  No adequate post-deprivation remedy exists for Plaintiffs under state law.

WHEREFORE, Plaintiffs request that they be awarded damages, costs, and fees against the Town of Monroe as prayed for below.

## COUNT II: Monroe Board of Selectmen
## 42 U.S.C. §1983

106.    Plaintiffs reallege paragraphs 1 - 105 of the Complaint and incorporate same by reference hereunder.

107.    Defendants Nash, Thoreson, and Davis-Little were Selectmen of the Town of Monroe and their decisions, actions and directives were taken in their official capacity as selectmen of the Town of Monroe.  Defendants Thoreson and Davis-Little are officially and individually liable. Defendant Nash is liable in his official capacity.

108.    The orders of Defendants Nash, Thoreson, and Davis-Little with respect to the eviction of James Slavas and SRI from Building 1 were willful, illegal and in violation of the aforementioned constitutional and statutory rights of Plaintiffs including, but not limited to, G. L. c. 143, ss. 6, 7, 8, 9, and 10; G.L. c. 139, s. 2;  G.L. c. 30A, s. 20; G.L. c. 239; and G.L. c. 12, s. 11.

109.    Although made under color of law, the decisions were without foundation in law and the Defendants were deliberately indifferent to the constitutional and statutory rights of Plaintiffs. No adequate post-deprivation remedy exists for Plaintiffs under state law.

WHEREFORE, the Plaintiffs pray that damages, costs, and fees be awarded against Defendants Nash, Thoreson, and Davis-Little as prayed for below.

## COUNT III: Monroe Board of Survey
## 42 U.S.C. §1983

110.    Plaintiffs reallege paragraphs 1 - 109 of the Complaint and incorporate same by reference hereunder.

111.    Defendants Thoreson, Davis-Little, Eddington, and Oakes were acting in their capacity as members of the putative Board of Survey of the Town of Monroe and their decisions, actions and directives were taken in their official capacity.        Defendants Thoreson and Davis-Little are officially and individually liable.  Defendants Eddington and Oakes are liable in their official capacities.

112.    The orders of Defendants Thoreson, Davis-Little, Eddington, and Oakes with respect to the eviction of James Slavas and SRI from Building 1 were willful, illegal and in violation of the aforementioned constitutional and statutory rights of Plaintiffs including, but not limited to, G. L. c. 143, ss. 6, 7, 8, 9, and 10; G.L. c. 139, s. 2; G.L. c. 30A, s. 20; G.L. c. 239; and G.L. c. 12, s. 11.

113.    The actions of Defendants Thoreson, Davis-Little, Eddington, and Oakes with respect to the eviction of James Slavas and SRI from Building 1 and in requiring Plaintiffs to abort the removal of the equipment and other possessions of Slavas and SRI from Building 1 constituted an illegal search and seizure and violated the Plaintiffs' rights to due process of law and rights protected by the Fourth, Fifth, Ninth and Fourteenth Amendments of the Constitution of the United States.  No adequate post-deprivation remedy exists for Plaintiffs under state law.

WHEREFORE, Plaintiffs request that damages, costs, and fees as prayed for below be awarded against the Defendants Thoreson, Davis-Little, Eddington, and Oakes.

## COUNT IV: Monroe Building Commissioner
## 42 U.S.C. §1983

114.    Plaintiffs reallege paragraphs 1 - 113 of the Complaint and incorporate same by reference hereunder.

115.    Defendant Brenda J. Church was the Building Commissioner acting in an official capacity as a representative of the Town of Monroe.  The actions of Defendant Church were grossly negligent and constituted deliberate indifference to the constitutional rights of the Plaintiffs.  Ms. Church is named individually and in her capacity as Monroe's Building Commissioner.

116.    Defendant Church utterly disregarded the procedural requirements of G.L. c. 143, ss. 6, 7, 8, 9, and 10 in her determination to evict Mr. Slavas and SRI from Building 1.   The actions of

Defendant Church were reckless, willful and in gross disregard of the constitutional rights of Plaintiffs.

117.    Defendant Church violated the provisions of the Chapter 143 while recklessly disregarding the Open Meeting Law, G.L. c. 30A, s. 20, and the Constitutional protection afforded to the Plaintiffs by the Fourteenth Amendment Fourth, Fifth, Ninth and Fourteenth Amendments of the Constitution of the United States.

118.    The actions of Defendant Church with respect to the eviction of James Slavas and SRI from Building 1 and in requiring Plaintiffs to abort the removal of the equipment and other possessions of Slavas and SRI from Building 1 constituted an illegal search and seizure and violated the Plaintiffs' rights to due process of law and rights protected by the Fourth, Fifth, Ninth and Fourteenth Amendments of the Constitution of the United States.  No adequate post-deprivation remedy exists for Plaintiffs under state law.

WHEREFORE, the Plaintiffs respectfully request that damages, costs, and fees against Defendant Church be assessed as prayed for below.

## COUNT V: All Defendants
## Violation of G.L. c.12, s. 11

119.    Plaintiffs reallege paragraphs 1 - 118 of the Complaint and incorporate same by reference hereunder.

120.    Defendants, jointly and severally, by means of actions, decisions and threats designed to interfere or attempt to interfere with the exercise of Plaintiffs' constitutional rights and, in particular, their right to be free from the use or threat of force against them and their property, violated constitutional rights protected by Federal and State Constitutions to be free from the deprivation of property, without due process, freedom from search and seizure without due process, the right to be secure in their persons and home and free from unreasonable searches and seizures.

121.    Not only did Defendants, jointly and severally, deprive Plaintiffs of their constitutional rights, but they also interfered with the exercise of their rights by means of threats, intimidation, and coercion and grossly illegal and totally unauthorized activity purportedly acting under official authority, all of which interfered with Plaintiffs' ability to freely exercise their property rights protected by the federal and state constitutions.

122.    As a proximate cause of Defendants' conduct and, in particular, the threats, coercion and intimidation, Plaintiffs were injured and suffered damages, costs, and fees as prayed for below against all defendants.

WHEREFORE, the Plaintiffs respectfully request that damages, costs, and fees against Defendant Church be assessed as prayed for below.

## COUNT VI :  All Defendants
## Intentional Infliction of Emotional Distress

123.    Plaintiffs reallege paragraphs 1 - 122 of the Complaint and incorporate same by reference hereunder.

124.    The actions of the Defendants, jointly and severally, constituted an intentional infliction of emotional distress against James Slavas.

125.    The conduct of the Defendants, each and every one of them, was willful, deliberate, without legal authority, outrageous and extreme.

126.    The conduct of each and of every Defendant was without legal authority and was causally related to the eviction of James Slavas and SRI from Building 1 in violation of their legal right to possess the leasehold, the demise of SRI's business and profit, and the disruption if not the destruction of the property of SRI and James Slavas still contained in Building 1.

127.    The conduct of each and every of the Defendants was causally related to the destruction of the work, notes, experiments and research of James Slavas.

128.    The conduct of the Defendants, each and every one of them was outrageous in the extreme and was willful, wanton and reckless in their deliberate disregard of the rights of the Plaintiffs.

WHEREFORE, the Plaintiffs respectfully request that damages, costs, and fees against Defendant Church be assessed as prayed for below.

## COUNT VII: All Defendants
## Trespass

129.    Plaintiffs reallege paragraphs 1 - 128 of the Complaint and incorporate same by reference hereunder.

130.    Each and every Defendant named herein is liable, jointly and severally, in trespass against Plaintiffs.

131.    The actions of each and every Defendant constituted an affirmative, voluntary act in

illegally entering onto and deliberately and willfully interfering with the property, both real and personal of Plaintiffs.

132.    The eviction of James P. Slavas and SRI from Building 1 and the destruction of their equipment, work, experiments, notes, research and materials were directly related to the trespass and illegal and unauthorized entry onto the property caused by each of the Defendants.

WHEREFORE, Plaintiffs respectfully request that damages, costs, and fees against each of the Defendants be assessed as prayed for below.

**PRAYERS FOR RELIEF**

Plaintiffs, James P. Slavas and Spary Research, Inc., demand judgment as follows:

*       Against the Defendant Town of Monroe for compensatory damages in the amount of One Million ($1,000,000.00) Dollars or in such other amount as may be adjudicated.

*       Against the Monroe Board of Selectmen and Defendants Thoreson and Davis-Little, jointly and severally, in the amount of One Million ($1,000,000.00) Dollars as compensatory damages.

*       Against the Monroe Board of Survey and Defendants Thoreson and Davis-Little, jointly and severally, in the amount of One Million ($1,000,000.00) Dollars as compensatory damages.

*       Against the Defendant Church, in the amount of One Million ($1,000,000.00) Dollars as compensatory damages.

*       Against all Defendants for punitive damages as may be assessed by the jury at trial.

*       Plaintiffs additionally pray for attorney's fees and costs as provided for by 42 U.S.C. 1988, and as may be permitted under G.L. c. 12, s. 11.

*       For any such other relief as this Court may deem appropriate and just and as the Court may determine Plaintiffs may be entitled.

**PLAINTIFFS  DEMAND TRIAL BY JURY ON ALL ISSUES AND COUNTS OF THIS COMPLAINT.**

**PLAINTIFFS,**
**James P. Slavas and**
**Spray  Research, Inc.,**

**By their attorneys,**


/s/ Mark Bobrowski

Mark Bobrowski, BBO #546639
Adam J. Costa, BBO# 667840
Blatman, Bobrowski, Mead & Talerman, LLC
9 Damon Mill Square, Suite 4A4
Concord, MA 01742
(978) 371-2163