UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES P. SLAVAS and, | ) | |
| SPRAY RESEARCH, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 16-cv-30034-KAR |
| TOWN OF MONROE, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM AND ORDER REGARDING
DEFENDANTS' MOTION TO DISMISS
(Dkt. No. 9)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

Currently before the court is the motion of defendants Town of Monroe ("Monroe"),

David Nash, Larry Thoreson, Carla Davis-Little, D.J. Oakes, and Brenda J. Church to dismiss

the federal and state law claims brought against them by the plaintiffs, James P. Slavas and Spray

Research, Inc. ("SRI") (collectively, "Plaintiffs") in connection with the eviction of SRI from so-

called Building 1 of the former Deerfield Glassine Paper Mill in Monroe (Dkt. No. 9).  Plaintiffs

claim principally that Church, building commissioner for Monroe, with the other defendants,

violated their constitutional rights and various rights established by state law by evicting the

business from a building in which it was a hold-over lessee without a pre-deprivation hearing.

Each of the defendants moves to dismiss all claims asserted against it, him, or her.  The parties

have consented to this court's jurisdiction (Dkt. No. 15).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P.

73.  The court heard the parties at oral argument and took defendants' motion to dismiss under

advisement (Dkt. No. 30).  The court GRANTS so much of defendants' motion to dismiss as

seeks dismissal with prejudice of Plaintiffs' federal claims.  In view of the early stage of this

litigation, the court dismisses the pendent state law claims without prejudice to Plaintiffs'

reassertion of them in state court.

II.   STATUTORY FRAMEWORK

"Massachusetts law provides for both pre- and post-deprivation process in the

condemnation . . . of a building."  *S. Commons Condo. Ass'n v. City of Springfield*, 967 F. Supp.

2d 457, 460 (D. Mass. 2013), *aff'd* 775 F.3d 82 (1st Cir. 2014).  Massachusetts General Laws ch.

143, § 6 provides, in pertinent part, that a local building commissioner,

> immediately on being informed by report or otherwise that a building or other
> structure or anything attached thereto or connected therewith in that city or town
> is dangerous to life or limb or that any building in that city or town is unused,
> uninhabited or abandoned, and open to the weather, shall inspect the same; and he
> shall forthwith in writing notify the owner, lessee or mortgagee in possession to
> remove it or make it safe if it appears to him to be dangerous, or to make it secure
> . . . .  If it appears that such structure would be especially unsafe in case of fire, it
> shall be deemed dangerous within the meaning hereof, and the local inspector
> may affix in a conspicuous place upon its exterior walls a notice of its dangerous
> condition, which shall not be removed or defaced without authority from him.

Section 7 of Chapter 143 provides that an owner, lessee or mortgagee notified that a

building is dangerous has until noon the following day to remove the structure or make it safe.

*See S. Commons Condo. Ass'n*, 967 F. Supp. 2d at 460 (citing Mass. Gen. Laws ch. 143, § 7; 780

C.M.R. § 116.3).   If an owner, lessee, or mortgagee in possession of a building deemed to be

unsafe fails to take steps to repair, secure, or demolish the building, the town building

commissioner is charged with convening a properly constituted Board of Survey, which must

make "'a careful survey of the premises.'"  *Gallant v. City of Fitchburg*, 739 F. Supp. 2d 39, 42

(D. Mass. 2010) (quoting Mass. Gen. Laws ch. 143, § 8; 780 C.M.R. § 121.4).  "After the survey

is made, '[a] written report of such survey shall be made, and a copy thereof served' on the

owner." *Id.* (quoting Mass. Gen. Laws ch. 143, § 8). "[I]f the survey report 'declares such structure to be dangerous or to be unused, uninhabited or abandoned, and open to the weather,' and if the owner fails to make the building safe and secure, the building commissioner 'shall cause it to be made safe or taken down or to be made secure.'" *Id.* (quoting Mass. Gen. Laws ch. 143, § 9; citing 780 C.M.R. § 121.5). The building commissioner is authorized, if public safety so requires, to enter a dangerous building immediately, with such assistance as she may require, and, using the summary process procedures set forth in Massachusetts General Laws ch. 239 or otherwise, to remove or evict the building's tenants or occupants. *See* Mass. Gen. Laws ch. 143, § 9.

The statutory scheme provides a remedy for an individual with a property interest aggrieved by an order to make safe or remove a structure identified as dangerous.

> An owner can challenge such [an] order by appealing the order to the superior court for the county where the structure is located. Ch. 143, § 10 (providing that an owner may proceed under ch. 139, § 2, for a remedy when aggrieved); 780 C.M.R. § 116.6. *See generally Gallant*, . . . 739 F. Supp. 2d [at] 41-42 . . . (discussing the statutory scheme for orders to make buildings safe and secure and the remedies available to challenge such orders). Although this section allows for a challenge to the order, the [building commissioner's] actions are not halted by such a challenge. Ch. 143, § 10 (stating that 'no provision of [ch. 139, § 2] shall be construed so as to hinder, delay or prevent the local [commissioner] acting and proceeding under section nine"); 780 C.M.R. § 116.6.

> Consequently, in any circumstance where an owner desires to challenge the action taken by the building [commissioner] – whether it be the original order by the building [commissioner] or the immediate demolition of a structure deemed hazardous to public safety . . . – the owner must proceed under section 2 of chapter 139. The owner must commence a civil action within three days after the service of the challenged order. Chapter 139, § 2.

*S. Commons Condo. Ass'n*, 967 F. Supp. 2d at 461. "The property owner is afforded a jury trial for the purpose of affirming, annulling, or altering the order at issue." *Gallant*, 739 F. Supp. 2d at 42. Such actions have priority over other actions on the Superior Court docket. *See id.* The

remedy under section 2 of chapter 139 remains available even if suit is instituted after, rather than before, the property deprivation occurs. *See S. Commons Condo. Ass'n v. Charlie Arment Trucking, Inc.*, 775 F.3d 82, 90 (1st Cir. 2014). In other words, Massachusetts law provides for compensation if a jury subsequently decides that a challenged order was wrongly issued. *See id. See also Morais v. City of Lowell*, 738 N.E.2d 1158, 1161 (Mass. App. Ct. 2000) (plaintiffs' allegation that city and municipal officials failed to provide the notice required under Chapters 143 and 139 prior to vacating the building, thereby depriving plaintiffs of the opportunity to make the building safe, stated a claim under the Massachusetts Tort Claims Act, Mass. Gen. Laws ch. 258).

III.   FACTS ALLEGED IN PLAINTIFFS' COMPLAINT

1.   SRI and its Facilities

Slavas is the president and owner of SRI, a Massachusetts corporation engaged in testing, research, and product development related to spray atomizer performance, investigation of spray behavior, and application of spray technologies (Dkt. No. 1 at 2-4, ¶¶ 3, 21). On August 19, 1999, SRI entered into a fifteen-year lease arrangement with Monroe Bridge Holding Corporation, owner of the former Deerfield Glassine Paper Mill in Monroe. The mill complex consists of four separate buildings, known locally as the Green Building, Building 1, Building 2, and Building 3. SRI's lease was for the fourth floor of Building 1 (*id*. at 3, ¶¶ 16-18). On September 2, 1999, the Franklin County Cooperative Inspection Program issued a building permit to SRI to create a research and development laboratory in 4,145 square feet of the fourth floor of Building 1. The remainder of the space on the fourth floor served as a storage area. SRI's laboratory consisted of an extensive array of sophisticated and expensive equipment,

including large pieces such as a low-speed wind tunnel and a closed-loop water tunnel (*id.* at 3-4, ¶¶ 19, 22).

SRI did not renew its lease for space at Building 1 at the conclusion of the initial fifteen-year leasehold.  It nonetheless continued to occupy the premises in Building 1 and conduct its business therein (*id.* at 3-4, ¶¶ 18, 22, 24).

2. <u>SRI's eviction</u>

Church was appointed to the post of building commissioner by the Monroe Board of Selectmen on or around April 20, 2015 (*id.* at 4, ¶ 25).  At some point around the time of her appointment, she inspected the mill complex and decided that it was dangerous (*id.* at 5, ¶¶ 26, 28).  She did not notify Slavas of this determination (*id.,* ¶ 28).  Instead, she convened a Board of Survey, consisting of Larry Thoreson, Carla Davis-Little, D.J. Oakes, and Stephen Eddington (*id.* at 2-3, 6, ¶¶ 8-12, 31).[1]  On April 30, 2015, Davis-Little notified Slavas by telephone that the Board of Survey would be inspecting the mill complex on May 1, 2015 (*id.* at 7, ¶ 37).  On May 1, 2015, without posting a prior public notice of its intent do so, the Board of Survey convened its meeting and inspection at the mill complex, deliberating near SRI's loading dock for approximately ten minutes as recorded by a security camera (*id.,* ¶ 39).  The Board of Survey "determined that the entire mill complex was unsafe" (*id.*).

On May 13, 2015, Church sent Davis-Little an email stating:

> I have been doing some research on each step and will be sending it to you.  The first step is to start the foreclosure and then the building.  There are only four law firms that do this process in the state.  I have worked with one of them and will forward email.  This must be done so we can take action on the person who is in the building illegally.

---

[1] All claims against Stephen Eddington, initially named as a defendant, have been dismissed with prejudice, and he is no longer a party to this case (Dkt. No. 6).

(*id.* at 8, ¶ 43).  Davis-Little told the Board of Selectmen, which consisted of defendants David Nash, Larry Thoreson, and herself ("Selectmen"), about this email at a May 18, 2015 regularly scheduled meeting of the Selectmen (*id.* at 2, 8, ¶¶ 7-9, 43).

On May 19, 2015, without prior notice to Slavas or SRI, Church arrived at Building 1 with two Massachusetts State Troopers and Louise Vera, the State Building Inspector for District 2.  The troopers escorted Slavas from SRI's facilities, and Church posted the building with placards denominating Building 1 as "Condemned as Dangerous and Unsafe" (*id.* at 8, ¶ 45).

### 3. Post-Eviction Proceedings

On May 26, 2015, the Selectmen convened an emergency meeting to discuss Church's actions with regard to SRI and Building 1.  Slavas attended the meeting with his attorney and a representative of Whetstone Engineering ("Whetstone"), an engineering firm Slavas had hired to perform a structural analysis of Building 1 and prepare a written report of the analysis (*id.* at 9, ¶¶ 51-52).  The results of the Whetstone analysis were presented to the Selectmen, and a copy of the written analysis was given to Church.  In its report, Whetstone stated that Building 1 was structurally competent and in no "imminent danger of failure or collapse endangering life and limb and/or public safety" (*id.*, ¶ 52).  According to the Whetstone report, the roof showed signs of recent leakage and minor repairs, but had no major damage or deterioration.  The loading dock, although in need of some repairs, was capable of handling the removal of SRI's laboratory equipment (*id.*).

Whetstone's conclusion that Building 1 was structurally sound was consistent with an analysis of the structural safety of the mill complex that had been commissioned by the Massachusetts Department of Transportation ("DOT") and performed approximately one year earlier in connection with the reconstruction of a highway bridge adjacent to the mill complex.

The DOT analysis had concluded that the Green Building was in poor condition.  As to Building 1, which housed SRI's laboratory, the DOT analysis noted "minor wear and tear" in SRI's space, cracks above a couple of windows, and staining and cracking on the north wall.  The DOT analysis, a copy of which DOT provided to the Town of Monroe, did not characterize Building 1 as structurally unsound (*id*. at 9-10, ¶ 53).

After the Selectmen heard from Whetstone, the Selectmen convened a closed executive session attended by Church and town counsel (*id*. at 8-10, ¶¶ 47, 51, 54).  During the executive session, Church gave the Selectmen a report prepared by the Board of Survey, entitled "Damaged remains of the Deerfield Glassine paper Mill, 16 Depot Street, Monroe, MA 01350" (*id.* at 8, ¶ 47).

On June 1, 2015, Slavas received a Revised Notice of Violation stating that it was Church's intention to give Slavas five days to remove the equipment he used to operate his business from Building 1 (*id.* at 10, ¶ 55).  Between June 1 and 6, 2015, Slavas and his employee worked fifteen hours a day to remove the most valuable and portable SRI equipment from Building 1 to a self-storage facility (*id.*, ¶ 57).  On June 3, 2015, at the request of town counsel, Slavas submitted a comprehensive list of SRI equipment that remained in Building 1, enumerating the tasks and time required to disassemble, pack, and remove the major pieces of equipment.  Slavas estimated that a minimum of 288 hours would be required for the task and requested the time he deemed necessary to complete removal of the SRI equipment (*id.* at 10-11, ¶ 58).  On June 5, 2015, Church issued a No Trespassing Order for the mill complex and directed SRI to submit, by June 12, 2015, a floor plan identifying the locations that housed equipment that needed to be moved, the safe egress paths to be used by movers, and a document from a Massachusetts design professional identifying the means and methods and egress paths for

removal of SRI's equipment (*id.* at 10-11, ¶ 60).  By June 11, 2015, Slavas had complied with this directive (*id.* at 11, ¶¶ 61-62).  On the same date, Slavas received a copy of the Board of Survey's report on the status of the buildings at the mill complex, in which the Board of Survey concluded that the mill complex was unsafe (*id.* at 8, ¶ 47).

On June 15, 2015, Church responded to Slavas's request for additional time to remove the SRI equipment.  She stated that Building 1 posed a danger to life and limb.  She approved a maximum of nine days with four workers working eight hours a day for removal of SRI's equipment from Building 1 (*id.* at 11, ¶ 63), but conditioned this access on her receipt of additional information from Slavas (*id.* at 11-12, ¶¶ 67-68, 76-78).  On August 8, 2015, Church notified Slavas that she was giving him from August 11th to August 21st to remove the equipment, after which the building would be secured and utilities to the building shut off.  Two days later, on August 10, 2015, the Selectmen voted to request that Church give Slavas and SRI 24 days to remove the SRI equipment.  The Selectmen stressed that they "would like this matter resolved" (*id.* at 13, ¶¶ 80-81).  Church acquiesced in the Selectmen's request, albeit under protest (*id.*, ¶ 82).

In the meantime, on June 4, 2015, Slavas had asked Gordon Bailey, the State Building Inspector for District 1, to conduct an expedited inspection of Building 1 to see if the eviction notice issued by Church was warranted.  Bailey referred the request to Vera, who was the Building Inspector for District 2 (*id.* at 10, ¶ 59).  On June 16, 2015, Slavas communicated his request for an inspection of Building 1 to Vera.  On June 18, 2015, Bailey, Vera, and Church inspected the exterior of Building 1.  Vera subsequently found that "the building is seriously compromised."  Vera did not provide Slavas with a detailed summary or report of the inspection that was the basis for her conclusion (*id.* at 12, ¶¶ 70-72).  The content of the Building

Inspector's report was the basis of Church's concern about allowing Slavas an extended period of time to remove SRI equipment from Building 1 (*id.* at 13, ¶ 82).

Ultimately, Slavas and his employee were unable to complete removing SRI equipment in the time authorized by Church.  Some heavy equipment was broken up for scrap and some SRI equipment remains in Building 1 (*id.* at 13, ¶ 83).  Plaintiffs claim damages based on the disruption of SRI's existing business and lost business opportunities, the value of lost SRI equipment and equipment replacement costs, and a loss of personal income for Slavas (*id.* at 14-15, ¶¶ 90-98).

IV.    DISCUSSION

1.    Standard of Review

To survive a motion to dismiss, a "complaint must contain enough factual material to raise a right to relief above the speculative level . . . and state a facially plausible legal claim," *Guerra-Delgado v. Popular, Inc*., 774 F.3d 776, 780 (1st Cir. 2014) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011)), "accept[ing] as true well-pleaded facts in the complaint and draw[ing] all reasonable inferences in the pleader's favor." *Id*. (citing *Tasker v. DHL Rev. Sav. Plan*, 621 F.3d 34, 38 (1st Cir. 2010)).  In resolving a motion to dismiss, the court employs a two-step approach.  *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) (citing *Ocasio-Hernández*, 640 F.3d at 12).

> First, [the court] "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *A.G. ex. rel. Maddox v. Elsevier, Inc*., 732 F.3d 77, 80 (1st Cir. 2013) (internal quotation marks omitted).  Second, [the court] "must determine whether the remaining factual content allows a reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (internal quotation marks omitted).

*Medina-Velázquez*, 767 F.3d at 108.  While "a complaint need not plead facts sufficient to make out a prima facie case or allege all facts necessary to succeed at trial," *id*. (citing *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 717-18 (1st Cir. 2014)), the elements of a prima facie case "form[] 'part of the background against which a plausibility determination should be made.'"  *Id*. (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013)).  "An analysis of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Id*. at 109 (quoting *Grajales v. P.R. Ports Auth*., 682 F.3d 40, 44 (1st Cir. 2012)).  That said, "the court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"  *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "[A] court [may not] attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if . . . a recovery is very remote and unlikely.'"  *Id*. at 12-13 (quoting *Twombly*, 550 U.S. at 556).

    2.  <u>Claims Asserted by Slavas</u>

The complaint alleges that SRI is a corporation licensed to do business in Massachusetts and that Slavas is its president and owner, and, impliedly, its sole shareholder (Dkt. No. 1 at 2, ¶¶ 3-4).  As an initial matter, the defendants have moved to dismiss all claims asserted by Slavas in Counts I through VII of the complaint on the ground that he lacks standing to assert claims that are solely for injuries to SRI (Dkt. No. 12 at 2-3).  "This argument invokes the shareholder-standing rule, under which a corporate shareholder (even a sole shareholder) may not sue in his own name to redress injuries suffered solely by the corporation."  *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 637 (1st Cir. 2013).  Slavas responds that the complaint alleges injuries personal to him, including financial losses resulting from the virtual destruction of SRI's

business, and contends that case law urges caution in the application of the shareholder-standing rule at this early stage of the litigation (Dkt. No. 14 at 2-3).  The court concludes that, at this point at least, Slavas has the better of the arguments.

A federal court must satisfy itself that it has jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims.  *See Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006) (citing *Orr v. Orr*, 440 U.S. 268, 271 (1979)).  "The standing inquiry is both plaintiff-specific and claim-specific.  Thus, a reviewing court must determine whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts."  *Id.*  Standing doctrine has two elements:  an "'irreducible constitutional minimum'" that must be satisfied and a prudential component.  *Gianfrancesco*, 712 F.3d at 637 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  The first, and essential, element requires that a plaintiff allege a concrete injury that can be traced to a defendant's conduct and is capable of being redressed.  The second prudential element "has various aspects, including a requirement that a party 'assert his own legal rights and interests,' not those of third parties."  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  "The shareholder-standing rule is a species of prudential limitation, not a component of the core constitutional standing requirement."  *Id.* (citing *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336-37 (1990)).

In *The Do Corp. v. Town of Stoughton*, No. Civ.A. 13-11726-DJC, 2013 WL 6383035 (D. Mass. Dec. 6, 2013), another session of this court considered an argument for dismissal that was virtually identical to the argument advanced here in factually analogous circumstances.  In *The Do Corp.*, the Town of Stoughton revoked the entertainment license of The Do Corporation ("TDC") and modified its liquor license following a series of disturbances on or near the

premises of the business.  The plaintiffs, TDC and Daniel Silva, the corporation's president, sued the town, members of its Board of Selectmen, and other town officials, alleging violations of their federal due process rights, the Massachusetts Civil Rights Act, and various state statutes. *Id.*, at **1-4.  Early in the litigation, the defendants challenged Silva's standing to bring claims on the ground that he lacked standing to assert injuries to the corporation.  *Id.*, at *4.

The court in *The Do Corp.* noted that the complaint alleged that TDC was an incorporated entity, not an entity "doing business as" ("d/b/a") that was actually operated by Silva.  *Contrast Gianfrancesco*, 712 F.3d at 637-38 (noting that "the ownership structure of Tom's Tavern is actually unclear;" where the complaint alleged variously that the tavern was a d/b/a operated by the individual plaintiff and that it was a Massachusetts corporation owned by the individual plaintiff).  Nonetheless, the court noted that "courts have been reluctant to conclude that a plaintiff lacks standing [under the shareholder standing rule] where 'it is difficult to state with confidence where plaintiff is asserting an injury to himself and where he asserts an injury to . . . his business entit[y].'"  *The Do Corp.*, 2013 WL 6383035, at *4 (quoting *Laverty v. Massad*, 661 F. Supp. 2d 55, 62 (D. Mass. 2009)).  Noting that Silva had alleged a personal financial injury resulting from the travails of TDC, and thereby satisfied the requirement that he allege a concrete injury traceable to the defendants' conduct that could be redressed by a court order, *see id.* at *5, the court declined to dismiss Silva's claims on the basis of the shareholder-standing rule "without prejudice to the Defendants' renewal of this motion on a more developed record."  *Id.* (citing *Gianfrancesco*, 712 F.3d at 638; *Laverty*, 661 F. Supp. 2d at 62).

Here, as in *The Do Corp.*, Slavas satisfies the requirement that the complaint allege a concrete injury to him personally that could be redressed by a court.  He claims a substantial reduction in his personal income by reason of the virtual destruction of SRI's business, which he

attributes to the defendants' actions (Dkt. No. 1, at 15, ¶¶ 90, 96).  *See The Do Corp.*, 2013 WL

6383035, at *5 (Silva asserted Article III constitutional standing because even if TDC was a

separate entity, Silva alleged that defendants' actions caused him actual financial injury); *see*

*also Gianfrancesco*, 712 F.3d at 638 (if the business was a corporate entity, the sole shareholder

would have Article III standing because actions taken against the business caused him actual

financial injury by driving the tavern out of business).  When, as in this case, a plaintiff has

Article III constitutional standing, "a [c]ourt may bypass the analysis of the shareholder standing

rule to reach the merits of the claims[.]"  *The Do Corp.*, 2013 WL 6383035, at *5.  The court

does so here, given the lack of clarity as to whether the injuries alleged in the complaint were

inflicted on SRI or on Slavas.  Additionally, in view of the court's conclusion that the complaint

fails to state any viable federal claim, a state court should rule on whether Slavas has viable state

law claims for injuries inflicted, at least in part, on SRI.

    3.  <u>Section 1983 Claims</u>

    The defendants move to dismiss Counts I, II, III and IV of the complaint, brought under

42 U.S.C. § 1983 ("§ 1983"), against the Town of Monroe, the Selectmen, the Board of Survey,

and Church, respectively.  "Section 1983 supplies a private right of action against a person who,

under color of state law, deprives another of rights secured by the Constitution or by federal

law."  *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011) (quoting *Redondo-Borges v. U.S.*

*Dep't of HUD*, 421 F.3d 1, 7 (1st Cir. 2005)).  A cause of action under § 1983 is comprised of

two essential elements.  First, because § 1983 does not reach private actions, *Rodríguez-Garcia*

*v. Dávila*, 904 F.2d 90, 95 (1st Cir. 1990), a plaintiff must show "that the conduct complained of

transpired under color of state law."  *Santiago*, 655 F.3d at 68 (citing *Redondo-Borges*, 421 F.3d

at 7).  Second, because "Section 1983 'is not itself a source of substantive rights,' but merely

provides 'a method for vindicating federal rights elsewhere conferred,'" *Albright v. Oliver*, 510 U.S. 266, 270 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)), a plaintiff must show "that a deprivation of federally secured rights ensued," *Santiago*, 655 F.3d at 68 (citing *Redondo-Borges*, 421 F.3d at 7).  There is no dispute "that the conduct complained of [here] transpired under color of state law." *Santiago*, 655 F.3d at 68.  Thus, the question is whether Plaintiffs have sufficiently stated a claim that they were deprived of federally secured rights.  Plaintiffs' principal claim is that they were deprived of property without due process of law when the Town of Monroe and its elected and employed representatives evicted SRI from Building 1 without advance notice or a hearing.  Plaintiffs also contend that their property was illegally seized in violation of the Fourth Amendment by the Board of Survey and Church (Dkt. No. 1 at 17-18, ¶¶ 113, 118).[2]

A.  Procedural Due Process Claims

The defendants' principal contention is that Plaintiffs' § 1983 claims fail because Plaintiffs have failed to plead a constitutionally protected property interest in SRI's laboratory facilities on the fourth floor of Building 1.  Even assuming that Plaintiffs had such a property interest, the argument continues, due process did not require a pre-deprivation hearing.  This is

---

[2] Plaintiffs also invoke the Fifth and Ninth Amendments of the United States Constitution in support of their § 1983 claims (Dkt. No. 1 at 17-18, ¶¶ 113, 118).  The Fifth Amendment provides, in pertinent part, that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law[,]" and applies only to actions of the federal government, not to the actions of private individuals or state actors.  *See, e.g., Gerena v. P.R. Legal Servs.*, 697 F.2d 447, 449 (1st Cir. 1983).  Plaintiffs have not alleged any action by any federal official.  The Ninth Amendment "does not create substantive rights beyond those conferred by governing law[,]" *Vega-Rodriguez v. P.R. Tel. Co.*, 110 F.3d 174, 182 (1st Cir. 1997), and "does not guarantee any constitutional right sufficient to support a claim under 42 U.S.C. § 1983." *DeLeon v. Little*, 981 F. Supp. 728, 734 (D. Conn. 1997).  Plaintiffs have not argued in their opposition to the defendants' motion to dismiss that they have distinct claims under either the Fifth or the Ninth Amendment.  To the extent the complaint seeks to assert any such claims, they are dismissed with prejudice for failure to state a cognizable claim.

so, according to the defendants, because, at most, Plaintiffs have alleged that Church erroneously invoked the summary procedures set forth in Chapter 143, and Massachusetts law provided an adequate post-deprivation remedy.  The court therefore turns first to the questions of whether Plaintiffs had a constitutionally protected property interest in the premises occupied by SRI, and, if so, whether SRI's eviction deprived Plaintiffs of their right to procedural due process.

      i.    <u>Constitutionally Protected Property Interest</u>

      "The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause."  *Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 9 (1978). Plaintiffs allege that, commencing in 2014, they had "a periodic tenancy at will" for the fourth floor of Building 1 and a constitutionally protected property interest "by virtue of this ongoing leasehold" (Dkt. No. 1 at 3, ¶18).

      "[C]onstitutionally protected property rights are determined by reference to 'an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'"  *Brown v. City of Barre*, 878 F. Supp. 2d 469, 482 (D. Vt. 2012) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); citing *Perry v. Sindermann*, 408 U.S. 593, 601-02 (1972); *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *Golden v. City of Columbia*, 404 F.3d 950, 955 (6th Cir. 2005)).  A plaintiff claiming a protected property interest must have a legitimate claim of entitlement that rises to the level of an interest protected by the Due Process Clause.  *See Memphis Light, Gas and Water Div.*, 436 U.S. at 9.  Such interests, however, may take many forms and extend beyond "actual ownership of real estate, chattels, or money."  *Roth*, 408 U.S. at 576, 571-72.  A constitutionally protected

property interest may be "pretty thin by conventional standards." *Herwins v. City of Revere*, 163

F.3d 15, 18 (1st Cir. 1998) (citing *Goldberg*, 397 U.S. at 254).

"Under Massachusetts landlord-tenant law, when a tenant holds over after the expiration

of the lease term, either a tenancy at will or a tenancy at sufferance results." *Spodek v. U.S.*

*Postal Serv.*, 35 F. Supp. 2d 160, 165 (D. Mass. 1999) (citing *Staples v. Collins*, 73 N.E.2d 729

(Mass. 1947); *Ames v. Beal*, 187 N.E.2d 99, 100 (Mass. 1933); *Benton v. Williams*, 88 N.E. 843

(Mass. 1909)).   "A tenant at sufferance has no estate nor title, but only a naked possession,

without right and wrongfully[.]" *Margosian v. Markerian*, 192 N.E. 612, 613 (Mass. 1934).  "A

tenant at sufferance is not entitled to notice to quit, but is a holder without right." *Id.* (citing

*Kelly v. Waite*, 12 Metc. 300, 302 (1847)).  When, however, "a lease contains a provision

governing the conditions of the lessee's occupancy in the event of holding over, the parties'

rights continue to be determined by the applicable provisions in the lease," and the holding over

"is said to be under the lease." *Cape Cod Shellfish & Seafood Co., Inc. v. City of Boston*, 19

N.E.3d 856, 860 (Mass. App. Ct. 2014).  Thus, while a tenancy at sufferance might not qualify as

a protected property interest, occupancy of property subject to the terms of a lease that addresses

the possibility of a hold-over tenancy is a "significant property interest" sufficient to implicate

the constitutional right to procedural safeguards. *Fuentes v. Shevin*, 407 U.S. 67, 87 (1972); *see*

*also Grayden v. Rhodes*, 345 F.3d 1225, 1236 (11th Cir. 2003) (due process generally requires

notice and a hearing prior to eviction).  "Whether a tenancy at will or a tenancy at sufferance was

created is ordinarily a question of fact," *Spodek*, 335 F. Supp. 2d at 165, and it is such a question

in this case.  Plaintiffs assert in the complaint that SRI had a fifteen-year lease with the owner of

the mill complex and, as of May 2015, had a tenancy at will and ongoing leasehold with respect

to the fourth floor of Building 1 (Dkt. No. 1 at 8, ¶ 18).  Therefore, Plaintiffs have sufficiently

alleged a constitutionally protected property interest in the premises in which SRI conducted its business.

    ii.    <u>Application of the *Parratt-Hudson* Doctrine</u>

        a.    <u>Failure to Provide a Pre-Deprivation Hearing</u>

"[D]ue process normally requires notice and the opportunity for 'some kind of hearing' *Memphis Light, Gas and Water Div.*, 436 U.S. [at] 19 . . ., prior to a final deprivation of liberty or property." *Herwins*, 163 F.3d at 18.  This generalization has been characterized by the First Circuit as a "very loose one" to which there are a number of exceptions.  *See id.*  When a plaintiff alleges a deprivation of a property interest by state officials who, by virtue of state law, have some measure of authority to effect the seizure of property, the issue is whether Plaintiffs "have raised a viable claim of deprivation of [their] federal due process rights as those rights have been articulated in the *Parratt-Hudson* doctrine."  *San Geronimo Caribe Project, Inc. v. Acevedo-Vila*, 687 F.3d 465, 478 (1st Cir. 2012) (en banc).[3]  In *Hudson*, the Supreme Court held that "when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur."  468 U.S. at 533.  This is so, said the Court, even when the employee's random and unauthorized conduct was intentional rather than negligent.  *See San Geronimo Caribe Project, Inc.*, 687 F.3d at 479 (citing *Hudson*, 468 U.S. at 533).  In such cases, so long as the government provides an adequate *post-deprivation* remedy, an individual claiming to have been deprived of a constitutionally protected property interest cannot claim a violation of procedural due process.  *See Herwins*, 163 F.3d at 18-19.

---

[3] The reference is to the doctrine set forth in *Parratt v. Taylor*, 451 U.S. 527 (1981), and *Hudson v. Palmer*, 468 U.S. 517 (1984).

The First Circuit has consistently "recognized that the failure to provide *pre-deprivation* process does not violate procedural due process when the deprivation of property 'results from conduct of state officials violative of state law.'" *Bourne v. Town of Madison*, 494 F. Supp. 2d 80, 89 (D.N.H. 2007) (quoting *PFZ Props., Inc. v. Rodriguez*, 928 F.2d 28, 31 (1st Cir. 1991)). Thus, in *Herwins*, the First Circuit reversed a verdict against a city board of health inspector, whom a jury found had falsely or recklessly reported that conditions in the plaintiff's building posed an immediate danger to tenants and evicted them on an emergency basis, because the jury's finding that there was no emergency "show[ed] only that [the health inspector's] substantive decision was wrong; he was not required to hold a hearing before declaring an emergency." *Id.*, 163 F.3d at 19. Because the city provided a post-deprivation remedy, there was no denial of procedural due process, even by the health inspector. *Id.* (citing *Parratt*, 451 U.S. at 543-44; *Hudson*, 468 U.S. at 536-37). Similarly, in *San Geronimo Caribe Project, Inc.*, the First Circuit affirmed dismissal of a developer's federal due process claims where, in related litigation in the Puerto Rican courts, the Puerto Rican Supreme Court had concluded that state officials had wrongly evoked emergency powers to shut down work on a major development project and thereby violated the developer's due process rights under Puerto Rican law, because "[t]he erroneous judgment by [the state officials] was exactly the type of 'random and unauthorized conduct' encompassed by *Parratt-Hudson*," and could not, therefore, be the basis of a federal procedural due process claim by the developer. *Id.* at 490.

More recently, the First Circuit affirmed dismissal of procedural due process claims brought by the owner-developer and tenants of a condominium complex that was summarily torn down after a tornado swept through Springfield, Massachusetts in June 2011. According to the complaint, the City did not provide advance notice to the residents or owner of the buildings that

it believed the buildings posed an immediate threat to public safety. It refused to allow tenants

access to the buildings to retrieve their belongings and arranged for the demolition of the

buildings the day after the tornado struck without undertaking any analysis addressing the extent

of the damage to the buildings, or assessing whether the buildings could be rehabilitated. *See S.*

*Commons Condo. Ass'n*, 775 F.3d at 84. In the face of claims by the plaintiffs that public safety

did not require barring all access to the buildings followed by their immediate demolition, the

First Circuit held that

> it d[id] not matter if the owners [we]re right that the City violated section 7 [of
> Chapter 143] because the 'public safety' did not in fact require the 'immediate'
> demolition that occurred [because] [t]he Supreme Court has made clear that
> government officials do not commit a federal procedural due process violation by
> erroneously applying a state law that, if followed, would survive a procedural due
> process challenge.

*Id.* at 89.

Notwithstanding these decisions, Plaintiffs contend that there is a distinction between

situations that reasonably might be viewed as presenting an emergency and those that obviously

do not. They assert that, viewing the allegations in the complaint in the light most favorable to

them, conditions at the mill complex fell into the latter category, as demonstrated by the

willingness of the municipality and Church to allow Slavas and his employee to enter the

building to remove equipment after Church had evicted SRI and posted Building 1 as condemned

(Dkt. No. 29 at 1-3). They rely on *Gallant*, which, they assert, stands for the proposition that

when there is no emergency, the state is required to provide notice and the opportunity for a

hearing before an eviction, which the defendants indisputably failed to do (*id.* at 3-5). For their

part, the defendants contend that the complaint alleges that the defendants proceeded, if

imperfectly, under sections 6 and 9 of Chapter 143, which authorize a local building

commissioner to take immediate steps to remedy conditions when a building appears dangerous.

19

In response to Plaintiffs' argument that they have not alleged that Church was addressing an emergency situation (Dkt. No. 29 at 1-3), the defendants point out that Plaintiffs allege that Church inspected the mill complex and deemed it dangerous, an assessment that was shared by the regional Building Inspector, and that Church posted the building with placards describing the building as condemned as dangerous and unsafe (Dkt. No. 1 at 5, 8, 12, ¶¶ 26, 28, 45, 71-72). *See* Mass. Gen. Laws ch. 143, § 6. The complaint further alleges that Church convened a Board of Survey pursuant to section 8 of Chapter 143, whose members prepared a report concluding that the entire mill complex was unsafe (*id.* at 7, ¶¶ 37. 39). Defendants contend that even if they were wrong about the danger posed by Building 1, this case is controlled by *South Commons Condo. Ass'n* in that, accepting Plaintiffs' allegations as true, Monroe officials did nothing more than erroneously apply the summary provisions of Chapter 143, conduct that cannot support a procedural due process claim. *See id.,* 775 F.3d at 89. In the court's view, the defendants have the better of the arguments.

Viewing the complaint in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, their claims rely on an allegedly erroneous application of those portions of Chapter 143 that authorize a local building commissioner to address and remedy conditions in dangerous or abandoned buildings. The complaint quotes the provisions of Chapter 143 at length (Dkt. No. 1 at 5-8, ¶¶ 27, 29, 31, 42, 48) and acknowledges that Church, Vera, and the Board of Survey represented at various points, as a basis for taking action, the belief that the buildings at the mill complex, including Building 1, were dangerous and unsafe (*id.* at 5, 7-8, 11-12, ¶¶ 28, 39, 45, 69, 72). Plaintiffs plead, as a basis for their claims, that their eviction from Building 1 "was not conducted in compliance with the procedures in G.L. c. 143, ss 6, 8, and 9" (*id.* at 8, ¶ 46), an allegation that is held against them in assessing whether their claims fit within

20

the line of authority established by *S. Commons Condo. Ass'n*, and its predecessors. *See San Geronimo Caribe Project, Inc.*, 687 F.3d at 491-92 (stating that allegations in a complaint are to be held against the pleader in assessing whether a complaint states a cause of action).

The relevant First Circuit cases do not support the distinction the Plaintiffs seek to draw between emergency and non-emergency situations. Indeed, a fundamental point of the decisions in *Herwins* and *San Geronimo Caribe Project, Inc.* is that government officials deprived the plaintiffs of constitutionally protected property interests without a pre-deprivation hearing by wrongfully invoking procedures intended to be used only in emergencies threatening public health and safety. In *Herwins*, the jury found that the health inspector had recklessly or falsely reported that emergency conditions required the immediate eviction of the owner and all of the tenants in the building. In essence, the health inspector fabricated emergency conditions to justify an immediate eviction. *Herwins*, 163 F.3d at 17; *see also S. Commons Condo. Ass'n*, 967 F. Supp. 2d at 466 ("Indeed, in the case of *Herwins*, the state actor was found to have acted falsely or recklessly."). In *San Geronimo Caribe Project, Inc.*, the statute under which the state officials ordered the developer to cease work authorized agencies to use emergency procedures only in extraordinary situations posing an imminent danger to public health, safety, and welfare. The state officials acted out of concern about the developer's title to the property on which it was building. The Puerto Rico Supreme Court held that doubt about the validity of the developer's title to the land being developed was not a situation that posed an imminent danger to public health, safety, and welfare. 687 F.3d at 477. In *S. Commons Condo. Ass'n*, while the aftermath of a tornado may more readily be identified as an emergency, the District Court nonetheless "assum[ed] . . . that a mistake, possibly an egregious mistake, was made," 967 F. Supp. 2d at 460, when public officials refused tenants access to the condominium complex to retrieve their

belongings and ordered the demolition of historic buildings without an engineering assessment of the need to do so.

Fairly read, Plaintiffs' complaint alleges that Church acted in error when she summarily evicted SRI and condemned Building 1 as dangerous and unsafe.  But, based on the allegations in the complaint, "the situation colorably supported invocation of [Chapter 143.]"  *Id.* at 467.  In addition to Church's conclusion that Building 1 was unsafe, the complaint alleges that the Board of Survey concluded that the entire mill complex was unsafe and that Vera, the Building Inspector for District 2, concluded that Building 1 was seriously compromised (Dkt. No. 1 at 8, ¶ 47; 12 at ¶¶ 70-72).  "Even where an error may have occurred, a federal lawsuit based on a violation of constitutional due process will not lie in these circumstances."  *S. Commons Condo. Ass'n*, 967 F. Supp. 2d at 467; *see also Herwins*, 163 F.3d at 19 ("*improper* use [of summary closure] is exactly the kind of 'random and unauthorized' conduct that the local government had no duty (and indeed no practical way) to forestall through a pre-deprivation  hearing").

The *Gallant* case is not to the contrary.  The court in *Gallant* acknowledged that "a mere violation of state procedural law [does not] constitute[] a denial of procedural due process," 739 F. Supp. 2d at 46, because, "'[t]o hold otherwise would convert every departure from established administrative procedures into a violation of the Fourteenth Amendment, cognizable under § 1983.'"  *Id.* (quoting *PFZ Props., Inc.*, 928 F.2d at 31).  "[T]hus, the alleged state law error – if error it was – cannot save [Plaintiffs'] procedural due process claim, at least so long as an adequate, post-hoc remedy is available."  *S. Commons Condo. Ass'n*, 755 F.3d at 89.

### b.  Adequacy of Post-Deprivation Remedy

Plaintiffs' alternative argument is that Church (and Montague) deprived them of an adequate post-deprivation remedy by failing to comply with the notice provisions in Chapter 143

(Dkt. No. 14 at 9-12).  Plaintiffs allege that Church, having concluded that the mill complex was unsafe, violated section 6 of Chapter 143 by failing to notify SRI, as lessee in possession, to make safe or secure Building 1, thereby depriving Plaintiffs of their ability to take the steps required by section 7 to make the building safe or secure or to challenge any such order pursuant to section 10 and Chapter 139, section 2; violated section 8 of Chapter 143 by failing timely to provide Slavas with a copy of the Board of Survey's report concluding that the entire mill complex was unsafe; and, when she finally provided a notice, indicating that any appeal could be had under Chapter 143, section 100, rather than section 10 (*id.* at 11-12).  According to Plaintiffs, *Gallant* "stands for the proposition that botched notice by the municipality is no notice at all," and that failure to provide proper notice is a basis for a procedural due process claim (*id.* at 12).

In the court's view, *Gallant* cannot save Plaintiffs' claims.  The court in *Gallant* observed that, under Chapter 143, after the plaintiff's receipt of a final notice of demolition, he had three days within which to file a suit in state court to challenge the demolition order.  The filing of such a suit, however, would "not operate to stay the impending demolition."  *Id.* at 46.  Because there was little likelihood that a case challenging a demolition order would be heard before the building was demolished, the court concluded that "[t]he statutory procedures may . . . – at least under some circumstances – be constitutionally inadequate."  *Id.* at 47.  After *Gallant* was decided, however, the First Circuit held, in *S. Condo. Ass'n*, that "section 2 [of Chapter 139] does constitute an adequate [post-deprivation] remedy."  775 F.3d at 91.  This, despite the fact that the City of Springfield did not give the plaintiffs the notice required by section 7 until *after* the buildings were torn down.  *Id.* at 89.  The First Circuit agreed with the municipality's argument that a post-demolition order remained subject to challenge and annulment by means of

a suit filed under section 2 of Chapter 139, and deemed the ability to recover damages under section 2 an adequate post-deprivation remedy, notwithstanding that the time to bring a claim under section 2 is, at least on its face, very short. *Id.* at 90-91.  Plaintiffs' argument also appears to be foreclosed by *Herwins*, where the plaintiff argued that the municipality's failure to provide him with a notice from which he could have appealed the shutdown of his building deprived him of an adequate post-deprivation remedy. *Herwins*, 163 F.3d at 19-20.  The court held that "[t]he state's failure to provide a landlord with express notice that he can seek review may violate state law but does not render the review remedy constitutionally inadequate." *Id.* at 20.  Thus, Church's failure to provide Plaintiffs with proper notice of their remedies does not render those remedies constitutionally inadequate.

That the statutory post-deprivation remedies may no longer actually be available to Plaintiffs does not change the analysis.  In *Herwins* and *S. Commons Condo. Ass'n*, the First Circuit acknowledged that the plaintiffs might be foreclosed from invoking the statutory post-deprivation remedies under discussion.  As was the case in *Herwins* and *S. Commons Condo. Ass'n*, Plaintiffs in the instant case have not alleged that they attempted to exercise their rights under section 2 of Chapter 139 (or under the Massachusetts Tort Claims Act).  Plaintiffs cannot be heard to complain about deficiencies of a constitutional dimension in the post-deprivation remedy (or remedies) provided by the state when they did not attempt to pursue their rights under the applicable statutory provisions.  *See S. Commons Condo. Ass'n*, 775 F.3d at 91 ("If it is now too late for the owners to bring a challenge under section 2, that is a function in this case of when the owners sought to avail themselves of the remedy, rather than its necessary constitutional inadequacy."); *Herwins*, 163 F.3d at 20 (holding that plaintiff could not show that the statutory

remedy was constitutionally inadequate where he "made no . . . effort to appeal even belatedly").[4]

      c.   The *Parratt-Hudson Doctrine Shields the City and the Individual Defendants*

The First Circuit has consistently ruled that the *Parratt-Hudson* doctrine shields not only the municipality charged with wrongdoing, but also the individuals whose actions allegedly violated a plaintiff's right to procedural due process.  In *Herwins*, the court observed that

> the law might have developed to hold the official liable under the Fourteenth
> Amendment for his own mistake even if the state had done all it could. . . .  But
> the Supreme Court has ruled that in such cases there is no denial of *procedural*
> due process, even by the official, so long as the state provides an adequate means
> of redress.

*Herwins*, 163 F.3d at 19 (citing *Parratt*, 451 U.S. at 543-44; *Hudson*, 468 U.S. at 536-37).  *See also S. Commons Condo. Ass'n*, 775 F.3d at 83 n.1 (addressing the potential liability of the municipality and individually named defendants, including the Mayor, the Building Commissioner, and the Deputy Director of Code Enforcement, collectively); *San Geronimo Caribe Project, Inc.*, 687 F.3d at 490 (reasoning as to failure of procedural due process claim extends to all individual defendants).

---

[4] Indeed, there is even less reason here than there was in *Herwins* or *S. Commons Condo. Ass'n* to find that Plaintiffs were deprived of an adequate post-deprivation remedy.  According to the complaint, Plaintiffs had a hearing and the opportunity to make their case to Church and the Selectmen at a meaningful time, i.e., immediately after the eviction but before any equipment had been removed from the building (Dkt. No. 1 at 9, ¶¶ 51-52).  On May 6, 2015, the Selectmen scheduled an emergency hearing to address Church's "actions with regard to SRI and Building 1," which Plaintiff attended with his attorney and a representative from Whetstone, the company he had hired to perform a structural analysis of Building 1 (*id.*).  The Selectmen received information from Plaintiff, Whetstone, "and other members of the public in open session" (*id.* at 10, ¶ 53).  The court acknowledges, however, that the adequacy of this hearing as a post-deprivation remedy is not a question that can be resolved at this stage of the case.  *See Amsden v. Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (noting the basic procedural due process requirement that the opportunity to be heard must come at a meaningful time and be conducted in a meaningful manner).

Plaintiffs' procedural due process claims as against the members of the Board of Survey and the Selectmen, also fail independently for other reasons.  Members of the Board of Survey are alleged to have done nothing more than conduct a survey of the condition of the mill complex after Church convened them for that purpose.  *See* Mass. Gen. Laws ch. 143, § 8. Nothing in Chapter 143 authorizes or requires a Board of Survey convened by a building commissioner to provide an affected property owner or lessee with any form of notice or hearing prior to conducting such a survey, although a member of the Board of Survey provided informal advance notice of the inspection in this instance (Dkt. No. 1 at 7, ¶ 37).  The statute does not specify that the Board of Survey – as opposed to the building commissioner – is required to serve a copy of its report on the owner, lessee, or mortgagee in possession, *see* Mass. Gen. Laws ch. 143, § 8, nor does the issuance of such a report trigger any further right to a hearing for an owner, lessee, or mortgagee in possession.  *See* Mass. Gen. Laws ch. 143, § 9.[5]  Plaintiff has not alleged that the Board of Survey, in the report or otherwise, ordered the municipality or the building commissioner to violate Plaintiffs' right to due process, or that the Board of Survey had any authority to direct the actions of the municipality or the building commissioner.  For this additional reason, Plaintiffs' procedural due process claims against members of the Board of Survey, individually and in their capacity as members of the Board of Survey, necessarily fail. *See San Geronimo Caribe Project, Inc.*, 687 F.3d at 491; *see also Velez-Rivera v. Agosto-Alicea*,

---

[5] Plaintiffs' references to alleged violations of the Open Meeting Law, Mass. Gen. Laws ch. 30A, § 21(a)(1), are unavailing because there is no private right of action for an individual plaintiff under the statute.  *See O'Rourke v. Hampshire Council of Govs.*, 121 F. Supp. 3d 264, 275 (D. Mass. 2015).  "Rather, the law provides that 'the attorney general or 3 or more registered voters may initiate a civil action to enforce the open meeting law.'"  *Id.* (citing Mass. Gen. Laws ch. 30A, § 23(f)).

437 F.3d 145, 156 (1st Cir. 2006) (it is well-settled that only those who participated in conduct that deprived plaintiffs of their constitutional rights can be held liable).

Plaintiffs' claims against the Selectmen are similarly deficient.  While Plaintiffs acknowledge in their opposition to defendants' motion to dismiss that "the statutory scheme clearly puts the responsibility for implementation of Chapter 143 on the local building inspector" (Dkt. No. 14 at 5), they contend that discovery is necessary to determine "just who was calling the shots" (*id.*).  Chapter 143, however, designates the building commissioner of a town as the "administrative chief in a city or town responsible for administering and enforcing the state building code" in a town.  *See* Mass. Gen. Laws ch. 143, § 3.  Section 9 of Chapter 143 authorizes the local building commissioner – not the Selectmen – to "enter [an unsafe structure] . . . with such assistance as [s]he may require, and . . . remove and evict, under the pertinent provisions of chapter two hundred thirty-nine or otherwise, any tenant or occupant thereof." Moreover, Plaintiffs' complaint alleges that the Selectmen voted to request that Church give Slavas additional time to remove SRI equipment from Building 1 (Dkt. No. 1 at 13, ¶ 81), acknowledging, at least by reasonable inference, that the Selectmen lacked authority to "call the shots" as to the eviction.  Plaintiffs' procedural due process claim rests on the allegations that Church evicted Plaintiffs without providing the prior notice required under section 6 and without providing a copy of the Board of Survey report required by section 8 (Dkt No. 1 at 8, ¶ 45). Because Plaintiffs' claim in Count II against the Selectmen rests on orders with respect to the eviction, and because there are no such orders allegedly issued by the Selectmen and the relevant statutes do not confer authority to evict on the Selectmen, any claim against the Selectmen would rest on impermissible speculation.  *See Guerra-Delgado*, 774 F.3d at 780; *Velez-Rivera*, 437 F.3d at 156.

In summary, the court finds that, under the First Circuit's holdings in *S. Commons Condo. Ass'n*, *San Geronimo Caribe Project, Inc.*, and *Herwins*, the *Parratt-Hudson* doctrine applies to preclude Plaintiffs' claims that the municipality and its officials violated their procedural due process rights in connection with SRI's eviction from Building 1.  The complaint, therefore, fails to state such a claim.  Accordingly, Counts 1-IV will be dismissed with prejudice.

B.  <u>Substantive Due Process</u>

The complaint does not separately allege that the defendants' actions violated Plaintiffs' substantive due process rights, but the opposition to defendants' motion to dismiss plainly does so (Dkt. No. 1, at 16-18, ¶¶ 105, 109, 113, 118; Dkt. No. 14 at 13).  Defendants argue summarily that the conduct alleged, taken as true, does not meet the stringent test for pleading a substantive due process claim (Dkt. No. 12 at 15).  "The court must determine if, as a matter of law, Plaintiffs have failed to make out a claim for relief."  *S. Commons Condo. Ass'n*, 967 F. Supp. 2d at 468 (citing *Gallant*, 739 F. Supp. 2d at 48).

"For Plaintiffs to adequately allege a claim for violation of substantive due process, they must show that (1) Defendants violated a right protected by the substantive Due Process Clause and (2) Defendants' actions 'shock the conscience.'"  *Id.* (quoting *Martinez v. Cui*, 608 F.3d 54, 64 (1st Cir. 2010)).  The court has already found that Plaintiffs have adequately alleged deprivation of a protected property right.  Thus, the remaining question "is whether the factual allegations, if proven, adequately describe state action that '*in and of itself* [was] egregiously unacceptable, outrageous, or conscience-shocking.'"  *Id.* (alteration in original) (quoting *Amsden*, 904 F.2d at 754).  The determination the court must make is fact based and objective.  Nonetheless, the First Circuit has established certain general guidelines applicable to an initial pleading.

> [I]n order to shock the conscience, conduct must at the very least be "extreme and outrageous," [*Depoutot v. Raffaelly*, 424 F.3d 112,] 118 [(1st Cir. 2005)], or, put another way, "truly outrageous, uncivilized, and intolerable." *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999). We also know that "[m]ere violations of state law, even violations resulting from bad faith," do not invariably amount to conscience-shocking behavior. *DePoutot*, 424 F.3d at 119. Rather, conscience-shocking behavior "must be stunning." *Amsden*, 904 F.2d at 754 n.5.

*Pagen*, 448 F.3d at 32. "Executive branch action that sinks to the depths of shocking the contemporary conscience is much more likely to find its roots in 'conduct intended to injure in some way unjustifiable by any government interest.'" *DePoutot*, 424 F.3d at 119 (quoting *Cnty of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).

Turning first to Church's actions, Plaintiffs have alleged that she committed legal error in their summarily evicting them from Building 1, and that she exhibited a distinct lack of courtesy and professionalism, but even on Church's part they have not alleged bad faith, malice, or an intent to cause injury in a way unconnected to a justifiable government interest. *See S. Commons Condo. Ass'n*, 775 F.3d at 92 (affirming dismissal of substantive due process claim where plaintiffs did not allege that municipality's summary decision to demolish buildings was product of bad faith or malice). While Church may have been negligent, or even grossly negligent, in summarily evicting SRI when eviction was not necessitated by Building 1's condition, the complaint alleges that she acted under the authority vested in her under Massachusetts law and Plaintiffs concede that Church, the Board of Survey, and the District 2 Building Inspector all concluded that the buildings at the mill complex were a danger to public safety. "It is crystal clear that mere allegations of mistakes by state officials, even if committed in bad faith, are insufficient to raise a claim for violation of substantive due process." *S. Commons Condo. Ass'n*, 967 F. Supp. 2d at 469. As to the remaining defendants, members of the Board of Survey are alleged to have done nothing more than inspect the mill complex and report on their findings

about the conditions of the buildings (Dkt. No. 1 at 7, ¶ 37).  Plaintiffs concede that the

Selectmen sought to alleviate the harm caused by the eviction by requesting that Church give

Plaintiffs an extended period of time to remove SRI equipment from Building 1, thereby

negating any reasonable inference of malice or bad faith on the part of the Selectmen.

Plaintiffs again seek to rely on *Gallant* in support of their position that they have

adequately pled a substantive due process claim.  *Gallant* is distinguishable, however.  In

*Gallant*, the allegations were that, when the plaintiff received notice that the municipality

intended to demolish his building if he did not make repairs, he immediately boarded up the

building and secured the premises.  He then had a contractor put a new roof on the building and

sought assurances from the municipality that he was in compliance with its requirements.  When

he was asked to take further steps to secure the premises, he did so.  He then sought a building

permit, which the building commissioner issued.  On the very same day, however, the building

commissioner issued a notice of demolition, which the plaintiff received only after he had

obtained the building permit, completed repairs, and had the work inspected and approved by the

municipality's building inspector.  The same day the plaintiff received the notice of demolition,

the municipality's officials issued a notice of pending demolition, which the plaintiff did not

receive until after his building had been demolished.  *Gallant*, 736 F. Supp. 2d at 43-44.  A

reasonable inference from the *Gallant* complaint was that the municipality deliberately

concealed its intention of demolishing the plaintiff's building while knowing that he was

investing substantial time, effort, and money in complying with the municipality's orders to

ameliorate its condition.  In contrast, Plaintiffs in the instant case have not alleged that they

expended funds to comply with an order by the municipality to make repairs to Building 1 or that

they brought Building 1 into complete code compliance only to see it demolished without notice

by order of the same municipal office that had certified compliance with all orders to make repairs.

While "each determination of whether state conduct shocks the conscience is necessarily fact specific[,]" *Cruz-Erazo v. Rivera-Montanez*, 212 F.2d 617, 623 (1st Cir. 2000), "[m]eritorious substantive due process claims in the context of a land use dispute are rare." *Bourne*, 494 F. Supp. 2d at 89. This is not such a rare case. The court does not doubt that the events alleged were highly disruptive to SRI's business and distressing to Slavas, SRI's sole owner. However, "[b]eyond the alleged procedural deficiencies, Plaintiffs do not allege any facts that give rise to a reasonable inference that the [municipality] went about [evicting SRI] in a manner that 'shocks the conscience.'" *S. Commons Condo. Ass'n*, 967 F. Supp. 2d at 469 (citing *Martinez*, 608 F.3d at 119). For the foregoing reasons, defendants' motion to dismiss so much of Counts I-IV as allege a substantive due process claim will be dismissed with prejudice. *See id.*

C. Fourth Amendment Violations

Plaintiffs claim that the actions of Church with respect to the eviction of SRI "and in requiring Plaintiffs to abort the removal of the equipment and other possessions of Slavas and SRI from Building 1 constituted an illegal search and seizure and violated Plaintiffs' rights . . . protected by the Fourth . . . Amendment[] of the Constitution of the United States" (Dkt. No. 1 at 18, ¶ 118). The allegations supporting this claim are that, on May 9, 2015, Church arrived unannounced at Building 1, accompanied by Vera and two Massachusetts State Troopers. The law enforcement officers escorted Slavas from Building 1, and Church posted the building as condemned (*id.* at 8, ¶ 45). She thereafter refused Slavas adequate time to remove all of SRI's equipment from the building (*id.* at 10-14). Although Plaintiffs' allegations about the activities

of members of the Board of Survey are limited, Count III of the complaint raises claims under the Fourth Amendment against these defendants as well (*id.* at 17, ¶ 113).  As a basis for dismissal of these claims, defendants argue that, even if Church infringed on Plaintiffs' Fourth Amendment rights, she is entitled to qualified immunity for her conduct.  Plaintiffs, who omitted any response to this contention and failed to mount any defense of these claims in their opposition and reply briefs, have arguably waived these claims.  *See Snyder v. Collura*, 812 F.3d 46, 51 (1st Cir. 2016) (holding that plaintiff's failure to identify claim and facts on which it rested before trial court waived theory of recovery argued for the first time on appeal).  Nonetheless, a court should not automatically treat Plaintiffs' failure to oppose dismissal of Plaintiffs' Fourth Amendment claims as a procedural default.  *See Phaneuf v. Lustig, Glaser & Wilson, P.C.*, 148 F. Supp. 3d 72, 74 (D. Mass. 2015).  Accordingly, the court considers whether the complaint alleges an adequate basis for the Fourth Amendment claims stated in Counts III and IV, and, if so, whether any defendant is entitled to invoke the defense of qualified immunity.

The Fourth Amendment protects citizens against seizures of property by state actors.  *See* U.S. Const. amend. IV; *Soldal v. Cook County*, 506 U.S. 56, 65-67 (1992).  "A 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interest in that property.'"  *Soldal*, 506 U.S. at 61 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  The court has already concluded that Plaintiffs have alleged a property interest in the premises occupied by SRI in Building 1, nor is there any doubt that they had a constitutionally-protected property interest in SRI's equipment.  *See* U.S. Const. amend. IV (Fourth Amendment protects against unreasonable seizure of "effects").  In order to be actionable, however, "a seizure must also be objectively unreasonable."  *Thomas v. Cohen*, 304 F.3d 563, 574 (6th Cir. 2002); *Downeast Ventures, Ltd. v. Washington Cty.*, Civil No. 05-87-B-

W, 2007 WL 1745630, at *10 (D. Me. June 13, 2007) (the touchstone standard for a Fourth

Amendment violation is objective reasonableness, which entails examination of the defendants'

actions in light of the facts and circumstances then known to them).  Because the defendants

have invoked the defense of qualified immunity, if the court concludes that there was a violation

of Plaintiffs' Fourth Amendment rights, then the court must address whether any of these

defendants violated a constitutional right of Plaintiffs that was clearly established at the time of

the alleged violation; and whether reasonable officials in the position of Church and the Board of

Survey would have understood that their conduct violated the clearly established right at issue.

*See Higgins v. Penobscot Sheriff's Dept.*, 446 F.3d 11, 13, 15 (1st Cir. 2005) (per curiam).  It is

not mandatory that the court follow the two-step analysis sequentially.  Qualified immunity

provides immunity from suit, not just from damages.  Particularly at the pleading stage, if the

question of whether a defendant has violated a constitutional right is difficult or heavily fact-

bound, the court may proceed immediately to the second step of the qualified immunity analysis.

*See Maldonado v. Fontanes*, 568 F.3d 263, 269-70 (1st Cir. 2009).

      i.      Members of the Board of Survey

     As to members of the Board of Survey, Plaintiffs' claims under the Fourth Amendment

are disposed of easily.  Plaintiffs have not alleged in their complaint that members of the Board

of Survey played any role in the eviction other than in the most indirect fashion, i.e., by

preparing a report of their findings about the condition of the mill complex.  Although those

findings, inferentially, formed a part of the basis of Church's decision to evict SRI and condemn

Building 1, no member of the Board of Survey is alleged to have been present at the eviction,

had any communications with Slavas about the eviction, or made or contributed to any decision

about post-eviction access to the SRI equipment that remained in Building 1.  Because the

members of the Board of Survey – D.J. Oakes, Larry Thoreson, and Carla Davis-Little – did not participate in the conduct that allegedly violated Plaintiffs' Fourth Amendment rights, they cannot be held liable.  *See Velez-Rivera*, 437 F.3d at 156; *see also Maldonado*, 568 F.3d at 274 (a government official *who himself* inflicts truly outrageous, uncivilized and intolerable harm may be liable for alleged constitutional violations).[6]

    ii.    <u>Church</u>

In contrast, Church is alleged to have played a direct role in the eviction.  Although there is no allegation that Church entered Building 1 on May 19, 2015, or ever physically prevented Slavas from entering the building, it may fairly be inferred from the complaint that she initiated and organized the eviction.  It also may fairly be inferred that orders she issued after she condemned Building 1 resulted "in the allegedly wrongful seizure of numerous items of personal property [in the form of SRI equipment], which implicates the Fourth Amendment[.]" *Downeast Ventures, Ltd.*, 2007 WL 1745630, at *10.

There remains the question of whether SRI's eviction and the resulting seizure of a portion of its property was objectively unreasonable.  While the question is not free from doubt, the court believes that the actions taken by Church could not fairly be interpreted as unreasonable in light of the facts and circumstances known to her.  She had inspected the mill complex, including Building 1, and concluded that the buildings were dangerous.  Notwithstanding Plaintiff's allegations about evidence to the contrary from Whetstone and the

---

[6] There is no allegation in the complaint that the Board of Survey acts in any supervisory capacity with respect to the building commissioner, nor is there any basis in Chapter 143, which provides that the building commissioner is responsible for convening a Board of Survey, for such a contention.  *See* Mass. Gen. Laws ch. 143, § 8.  Thus, there is no viable case for supervisory liability under the Fourth Amendment on the part of members of the Board of Survey.  *See Maldonado*, 568 F.3d at 274-75.

DOT, Church's conclusions about the condition of the buildings were consistent with the view of the Board of Survey and that of the District 2 Building Inspector.  Chapter 143, while requiring notice Church allegedly failed to provide, conferred authority on her in her capacity as building inspector to act summarily in the event of danger to public health and safety.  Church's action in evicting SRI was subsequently discussed at a public and a closed executive meeting of the Selectmen, also attended by town counsel, and was not thereafter rescinded, despite the Whetstone analysis.  Church's role in SRI's eviction was effected under a "colorable [grant of] legal authority [in Chapter 143]," *Thomas*, 304 F.3d at 572, on which she could reasonably rely.  As to the seizure of SRI equipment, following SRI's eviction, Church allowed Slavas access to Building 1 to retrieve SRI's equipment on terms that might be found reasonable, given that she ultimately allowed him the time he claimed he needed to remove SRI equipment.

Even if Church violated Plaintiffs' Fourth Amendment rights, however, the court has no doubt that she is entitled to qualified immunity from suit and any liability for her actions.  "'[T]he qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'"  *Downeast Ventures, Ltd.*, 2007 WL 1745630, at *12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Even if the eviction violated a Fourth Amendment right of SRI or Slavas, an objectively reasonable municipal official in Church's position, relying on the summary authority granted in Chapter 143, would not have believed she was violating Plaintiffs' clearly established constitutional rights by conducting the summary eviction of a business from a building she believed to be in a dangerous condition.  It is well-established that the United States Constitution leaves room for swift governmental action to deal with the immediate dangers that damaged and abandoned properties may sometimes pose, and case law in this and other circuits confirms this proposition.  *See, e.g.,*

*S. Commons Condo. Ass'n*, 775 F.3d at 86; *Herwins*, 163 F.3d at 18-19; *see also Flatford v. City of Monroe*, 17 F.3d 162, 166-68 (6th Cir. 1994) (ruling that the city's Director of Building and Safety was entitled to qualified immunity for claims asserted by the plaintiffs under the Fourth and Fourteenth Amendments based on the summary eviction from their apartment).  Further, it is a fair inference from the complaint that Church knew that SRI did not have a current lease for the premises it was occupying in Building 1 (Dkt. No. 1 at 8, ¶ 43).[7]  Here, an objectively reasonable official in Church's position could conclude that she was authorized to initiate the orderly eviction of a business in SRI's position from a dangerous building, and entitled thereafter to control access to a building she had posted as condemned.  Moreover, so far as the court has been able to determine, there is no case in this or any other circuit holding that an eviction by a building inspector or commissioner in similar circumstances was in violation of a business tenant's Fourth Amendment rights.  Thus, the contours of Plaintiffs' claimed Fourth Amendment rights were not sufficiently clear that Church would have understood that what she was doing violated any such rights.  *See Maldonado*, 568 F.3d at 269.  Church is, therefore, entitled to qualified immunity with respect to Plaintiffs' Fourth Amendment claims.

    4.  <u>State Law Claims</u>

When a court has dismissed all claims over which it has original jurisdiction, the court may "'decline to exercise supplemental jurisdiction' over the remaining claims."  *S. Commons Condo. Ass'n*, 967 F. Supp. 2d at 469 (quoting 28 U.S.C. § 1367(c)(3)).

> Here, the court has dismissed all federal claims, with the result that only the state claims against [the defendants] remain.  "In deciding whether or not to retain jurisdiction on such an occasion, the . . . court must take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 257 (1st Cir. 1996).  Given the early

---

[7] According to Plaintiffs, Church referred in a May 13, 2015 email to Davis-Little to "tak[ing] action on the person who is in the building illegally" (Dkt. No. 1 at 8, ¶ 43).

stage of litigation, the court will exercise its discretion to decline supplemental jurisdiction over the remaining state claims.  The issues of potential liability[, standing,] and compensation in play here involve application of complex state law and regulation, as to which the state courts have the final say.  These issues lie more comfortably within the competence of the Massachusetts judiciary.  The court will therefore dismiss these state law claims without prejudice to Plaintiffs' assertion of them in state court.  *McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 74b (1st Cir. 2003) ("When federal claims are dismissed before trial, state claims are normally dismissed as well.") (alteration in original).

*Id.* at 469-70.

V.      CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss Counts I-IV of the complaint is granted and these counts are hereby dismissed with prejudice for failure to state a claim.  The motion to dismiss the state law claims in Counts V-VII is also granted, but these claims are dismissed without prejudice to their reassertion in state court.  The Clerk will enter a judgment of dismissal in this case, which may now be closed.

It is so ordered.

Dated: March    , 2017                          Katherine A. Robertson
                                                KATHERINE A. ROBERTSON
                                                UNITED STATES MAGISTRATE JUDGE